## Case No. 14,692d.

### UNITED STATES v. BURR.[1]

[Coombs' Trial of Aaron Burr, 37.]

Circuit Court, D. Virginia.  June 13. 1807.

CRIMINAL LAW — SUBPŒNA DUCES TECUM — TIME OF ISSUE—TO PRESIDENT—RIGHT TO—MATERIALITY OF EVIDENCE.

[1. Any person charged with a crime in the courts of the United States has a right, before as well as after indictment, to the process of the court to compel the attendance of his witnesses.]

[2. A subpœna may issue to the president of the United States to compel his attendance as a witness, and an accused person is entitled to it of course.]

[3. A subpœna duces tecum may issue to the president of the United States, directing him to bring any paper of which the party praying it has a right to avail himself as testimony.]

[4. In Virginia, a motion for a subpœna duces tecum is to the discretion of the court; and as a legal means of obtaining testimony it cannot be regularly opposed by the opposite party in his character as such.]

[5. A motion to the discretion of a court is a motion not to its inclination, but to its judgment, which is to be guided by sound legal principles.]

[6. The court has no right to refuse its aid to motions for papers to which the accused may be entitled, and which may be material to his defense.]

[7. An accused person has the right, before indictment found, to compel, by way of precaution, the production of letters containing statements of his conduct written by the person who is declared to be the essential witness against him.]

[8. And in such case he is entitled to the production of the original letter, a copy not being sufficient.]

[9. Where it does not affirmatively appear that letters and executive orders in the hands of the president of the United States which may be material to the defense of an accused contain any matter which it would be imprudent to disclose, a subpœna duces tecum will issue. The fact that such letters and orders may contain matter not essential to the defense, and which ought not to be disclosed, will appear on the return.

[At law. Motion for a subpœna duces tecum directed to the president of the United States.]

[Tuesday, June 9, 1807. The grand jury were adjourned to the following Thursday.]

Mr. Burr then addressed the court. There was a proposition which he wished to submit to them. In the president's communication to congress, he speaks of a letter and other papers which he had received from Mr. Wilkinson, under date of 21st of October. Circumstances had now rendered it material that the whole of this letter should be produced in court; and further, it has already appeared to the court, in the course of different examinations, that the government have attempted to infer certain intentions on my part from certain transactions. It becomes necessary, therefore. that these transactions should be accurately stated. It was, therefore, material to show in what circumstances I was placed in the Mississippi territory; and of course, to obtain certain orders of the army and the navy which were issued respecting me. I have seen the order of the navy in print; and one of the officers of the navy had assured me that this transcript was correct. The instructions in this order were, to destroy my person and my property in descending the Mississippi. Now I wish, if possible, to authenticate this statement; and it was for this purpose. when I passed through Washington lately, that I addressed myself to Mr. Robert Smith. That gentleman seemed to admit the propriety of my application, but objected to my course. He informed me that if I would apply to him through one of my counsel, there could be no difficulty in granting the object of my application. I have since applied in this manner to Mr. Smith, but without success. Hence I feel it necessary to resort to the authority of this court to call upon them to issue a subpœna to the president of the United States, with a clause, requiring him to produce certain papers; or, in other words, to issue the subpœna duces tecum. The attorney for the United States will, however, save the time of this court, if he will consent to produce the letter of the 21st October, with the accompanying papers, and also authentic orders of the navy and war departments.

Mr. Hay declared that he knew not for what this information could be wanted; to what purpose such evidence could relate; and whether it was to be used on the motion for commitment or on the trial in chief.

Mr. Burr, Mr. Wickham, and Mr. Martin

---

1 [For references to the various cases in this series, which, together, embrace a full report of the entire proceedings against Aaron Burr, see footnote to Case No. 14,692a.]

observed that perhaps it would be used on both, according as circumstances might require.

Mr. Hay declared that all delay was unnecessary; but he pledged himself, if possible, to obtain the papers which were wanted; and not only those, but every paper which might be necessary to the elucidation of the case.

After considerable of conversation between counsel as to the objects of applying for the subpœna, and the probability of obtaining the papers without it, Mr. Wickham remarked that as to the order from the navy department, a copy might be sufficient, but as to Wilkinson's letter, "We wish to see itself here; and surely it may be trusted in the hands of the attorney for the United States."

Mr. Hay then said: It seems, then, that copies of papers from the government of the United States will not be received! After such an observation, sir, I retract everything that I have promised; let gentlemen, sir, take their own course.

Mr. Wickham explained, disavowing any insinuation against the fairness of the conduct of the government. But he wanted the highest possible degree of evidence, and to confront General Wilkinson with his own letter.

Mr. Hay was satisfied with the explanation, and renewed his promise to apply for the papers if the court deemed them material.

After some further conversation which did not result in any arrangement satisfactory to Mr. Burr's counsel—

The CHIEF JUSTICE said: If the attorney for the United States is satisfied that the court has a right to issue the subpœna duces tecum, I will grant the motion.

Mr. Hay. I am not, sir.

CHIEF JUSTICE. I am not prepared to give an opinion on this point, and therefore I must call for argument.

After some further conversation, the court adjourned.

Wednesday, June 10, 1807.

The court met according to adjournment. The subject of the subpœna duces tecum was resumed.

The following affidavit, drawn up and sworn to by Mr. Burr, was read in support of the motion for the subpœna.

"Aaron Burr maketh oath, that he hath great reason to believe that a letter from General Wilkinson to the president of the United States, dated 21st October, 1806, as mentioned in the president's message of the 22d January, 1807, to both houses of congress, together with the documents accompanying the said letter, and copy of the answer of said Thomas Jefferson, or of any one by his authority, to the said letter, may be material in his defence, in the prosecution against him. And further, that he hath reason to believe the military and naval orders given by the president of the United States, through the departments of war and of the navy, to the officers of the army and navy, at or near the New Orleans stations, touching or concerning the said Burr, or his property, will also be material in his defence.

"Aaron Burr.

"Sworn to in open court, 10th June, 1807."

Upon this motion a protracted debate arose, occupying two entire days, and extending into the third, in which the motion was supported by Messrs. Wickham, Botts, Randolph, Martin, and Burr, and opposed by Messrs. Hay, MacRae, and Wirt. Much ability and eloquence were displayed on both sides. But few points of law were contested in the argument, and these are all clearly stated in the opinion of the court, which is here given in full. The arguments turned more upon the propriety of granting the motion, than upon any strictly legal question; although the right of the accused to apply to the court for process to obtain any testimony whatever, at this stage of the case, was denied by the counsel for the United States. The discussion took a wide range, and the course of the government towards Col. Burr, and the conduct of Gen. Wilkinson in respect to him, were animadverted upon with much severity by counsel for the defence, and zealously defended by the counsel for the United States.

On the part of the prosecution it was insisted that the subpœna was unnecessary, because certified copies of any documents in the executive departments could be obtained by a proper application. It was said to be improper to call upon the president to produce the letter of Gen. Wilkinson, because it was a private letter, and probably contained confidential communications, which the president ought not and could not be compelled to disclose. It might contain state secrets, which could not be divulged without endangering the national safety. It was argued that the documents demanded could not be material to the defence, and objected that the affidavit did not even state, in positive terms, that they would be material.

On the part of the defence it was denied that any affidavit whatever was necessary to support the motion. The proposition that the president could withhold a paper material to the defence, merely because it contained confidential communications, was denied, and pronounced wholly untenable in law. If the letter contained state secrets which it would be inconsistent with the public safety to disclose, the president could say so in the return to the subpœna; but it was not to be assumed until he did say so. Or, if the letter contained anything of a confidential character, not relating to the case, the president could point out such parts as he did not wish to have exposed, and they need not be read in court. A copy of the letter, it was said, would not answer the purposes of the defence. Gen. Wilkinson was admitted to be the witness upon whom the prosecution mainly depended. His relation to the pros-

ecution was such, that he had the strongest possible motive for bolstering it up; and if he failed in it, he would himself sink into irreparable disgrace. When he should come upon the stand to sustain a prosecution in which he had so much at stake, it might be of the utmost importance to confront him with his letter in his own handwriting. A copy would not do, because he might deny it; and no confidence was reposed by the defence in his integrity. The contents of the letter were only known to the defence in so far as they had been divulged by the president in a communication to congress. In that communication the president had stated that he had received a letter from Gen. Wilkinson in relation to the transactions of Mr. Burr, "of whose guilt," he says, "there can be no doubt." The president was severely censured (by Mr. Randolph) for thus assuming the functions of a judge, and pronouncing judgment against Mr. Burr in transacting his executive duties. The president had stated in said communication that Gen. Wilkinson had written at large to him respecting Mr. Burr. The defence wanted this letter, and had no doubt that in some of those things which Gen. Wilkinson had stated to the president, they would be able to trip him up.

As to the orders of the war and navy departments, it was said that certified copies would answer. But the secretary of the navy had already refused to furnish copies to one of Mr. Burr's counsel, on an application to him therefor, and they could not run the risk of another refusal. One of these orders (or what purported to be one) had been published in the Natchez Gazette, and it amounted to an order calling forth a military force to attack Mr. Burr and his associates, and destroy their property. It was contended that the president had no legal or constitutional power to issue such an order as this was represented to be; and if an unconstitutional and illegal order had been issued to destroy any man and his property, that man was justified in resisting it. Authenticated copies of these orders, therefore, might be necessary to defend Mr. Burr against any attempt to prove that he had resisted, or made any preparation to resist, the military forces called forth against him. If no orders had been issued calling forth a military force to attack him, then he had a right to resist any such force as being a mere unauthorized mob. On these grounds it was of the utmost importance to the defence to know exactly what orders had been issued in relation to Col. Burr.

At the close of the discussion Mr. Hay said he had in his possession a copy of the very paper which had been so denounced by the counsel for cruelty and severity; the order issued by the secretary of the navy, which he proposed to read in order to show that there was no such thing in it. The opposite counsel desired to look at the paper, to ascertain whether it was the same they had seen in the Natchez Gazette; but Mr. Hay refused to let them take it. He finally put it up again, declaring that he believed it to be the same, but gentlemen did not want it to be read.

Before MARSHALL, Chief Justice, and GRIFFIN, District Judge.

MARSHALL, Chief Justice. The object of the motion now to be decided is to obtain copies of certain orders, understood to have been issued to the land and naval officers of the United States for the apprehension of the accused, and an original letter from General Wilkinson to the president in relation to the accused, with the answer of the president to that letter, which papers are supposed to be material to the defence. As the legal mode of effecting this object, a motion is made for a subpoena duces tecum, to be directed to the president of the United States. In opposition to this motion, a preliminary point has been made by the counsel for the prosecution. It has been insisted by them that, until the grand jury shall have found a true bill, the party accused is not entitled to subpoenas nor to the aid of the court to obtain his testimony. It will not be said that this opinion is now, for the first time, advanced in the United States; but certainly it is now, for the first time, advanced in Virginia. So far back as any knowledge of our jurisprudence is possessed, the uniform practice of this country has been, to permit any individual, who was charged with any crime, to prepare for his defence, and to obtain the process of the court, for the purpose of enabling him so to do. This practice is as convenient and as consonant to justice as it is to humanity. It prevents, in a great measure, those delays which are never desirable, which frequently occasion the loss of testimony, and which are often oppressive. That would be the inevitable consequence of withholding from a prisoner the process of the court, until the indictment against him was found by the grand jury. The right of an accused person to the process of the court to compel the attendance of witnesses seems to follow, necessarily, from the right to examine those witnesses; and, wherever the right exists, it would be reasonable that it should be accompanied with the means of rendering it effectual. It is not doubted that a person who appears before a court under a recognizance, must expect that a bill will be preferred against him, or that a question concerning the continuance of the recognizance will be brought before the court. In the first event, he has the right, and it is perhaps his duty, to prepare for his defence at the trial. In the second event, it will not be denied that he possesses the right to examine witnesses on the question of continuing his recognizance. In either case it would seem reasonable that he should be entitled to the process of the court to procure the attendance of his witnesses. The genius and character of our

laws and usages are friendly, not to condemnation at all events, but to a fair and impartial trial; and they consequently allow to the accused the right of preparing the means to secure such a trial. The objection that the attorney may refuse to proceed at this time, and that no day is fixed for the trial, if he should proceed, presents no real difficulty. It would be a very insufficient excuse to a prisoner, who had failed to prepare for his trial, to say that he was not certain the attorney would proceed against him. Had the indictment been found at the first term, it would have been in some measure uncertain whether there would have been a trial at this, and still more uncertain on what day that trial would take place; yet subpœnas would have issued returnable to the first day of the term; and if after its commencement other subpœnas had been required, they would have issued, returnable as the court might direct. In fact, all process to which the law has affixed no certain return day is made returnable at the discretion of the court. General principles, then, and general practice are in favor of the right of every accused person, so soon as his case is in court, to prepare for his defence, and to receive the aid of the process of the court to compel the attendance of his witnesses.

The constitution and laws of the United States will now be considered for the purpose of ascertaining how they bear upon the question. The eighth amendment to the constitution gives to the accused, "in all criminal prosecutions, a right to a speedy and public trial, and to compulsory process for obtaining witnesses in his favor." The right given by this article must be deemed sacred by the courts, and the article should be so construed as to be something more than a dead letter. What can more effectually elude the right to a speedy trial than the declaration that the accused shall be disabled from preparing for it until an indictment shall be found against him? It is certainly much more in the true spirit of the provision which secures to the accused a speedy trial, that he should have the benefit of the provision which entitles him to compulsory process as soon as he is brought into court. This observation derives additional force from a consideration of the manner in which this subject has been contemplated by congress. It is obviously the intention of the national legislature, that in all capital cases the accused shall be entitled to process before indictment found. The words of the law are, "and every such person or persons accused or indicted of the crimes aforesaid, (that is, of treason or any other capital offence,) shall be allowed and admitted in his said defence to make any proof that he or they can produce by lawful witness or witnesses, and shall have the like process of the court where he or they shall be tried, to compel his or their witnesses to appear at their or their trial as is usually granted to compel witnesses to ap-

pear on the prosecution against them." This provision is made for persons accused or indicted. From the imperfection of human language, it frequently happens that sentences which ought to be the most explicit are of doubtful construction; and in this case the words "accused or indicted" may be construed to be synonymous, to describe a person in the same situation, or to apply to different stages of the prosecution. The word "or" may be taken in a conjunctive or a disjunctive sense. A reason for understanding them in the latter sense is furnished by the section itself. It commences with declaring that any person who shall be accused and indicted of treason shall have a copy of the indictment, and at least three days before his trial. This right is obviously to be enjoyed after an indictment, and therefore the words are, "accused and indicted." So with respect to the subsequent clause, which authorizes a party to make his defence, and directs the court, on his application, to assign him counsel. The words relate to any person accused and indicted. But, when the section proceeds to authorize the compulsory process for witnesses, the phraseology is changed. The words are, "and every such person or persons accused. or indicted," &c., thereby adapting the expression to the situation of an accused person both before and after indictment. It is to be remarked, too, that the person so accused or indicted is to have "the like process to compel his or their witnesses to appear at his or their trial, as is usually granted to compel witnesses to appear on the prosecution against him." The fair construction of this clause would seem to be, that with respect to the means of compelling the attendance of witnesses to be furnished by the court, the prosecution and defence are placed by the law on equal ground. The right of the prosecutor to take out subpœnas, or to avail himself of the aid of the court, in any stage of the proceedings previous to the indictment, is not controverted. This act of congress, it is true, applies only to capital cases; but persons charged with offences not capital have a constitutional and a legal right to examine their testimony; and this act ought to be considered as declaratory of the common law in cases where this constitutional right exists.

Upon immemorial usage, then, and upon what is deemed a sound construction of the constitution and law of the land, the court is of opinion that any person charged with a crime in the courts of the United States has a right, before as well as after indictment, to the process of the court to compel the attendance of his witnesses. Much delay and much inconvenience may be avoided by this construction; no mischief, which is perceived, can be produced by it. The process would only issue when, according to the ordinary course of proceeding, the indictment would be tried at the term to which the subpœna is made returnable; so that it becomes incum-

bent on the accused to be ready for his trial at that term.

This point being disposed of, it remains to inquire whether a subpœna duces tecum can be directed to the president of the United States, and whether it ought to be directed in this case? This question originally consisted of two parts. It was at first doubted whether a subpœna could issue, in any case, to the chief magistrate of the nation; and if it could, whether that subpœna could do more than direct his personal attendance; whether it could direct him to bring with him a paper which was to constitute the gist of his testimony. While the argument was opening, the attorney for the United States avowed his opinion that a general subpœna might issue to the president; but not a subpœna duces tecum. This terminated the argument on that part of the question. The court, however, has thought it necessary to state briefly the foundation of its opinion, that such a subpœna may issue. In the provisions of the constitution, and of the statute, which give to the accused a right to the compulsory process of the court, there is no exception whatever. The obligation, therefore, of those provisions is general; and it would seem that no person could claim an exemption from them, but one who would not be a witness. At any rate, if an exception to the general principle exist, it must be looked for in the law of evidence. The exceptions furnished by the law of evidence, (with one only reservation,) so far as they are personal, are of those only whose testimony could not be received. The single reservation alluded to is the case of the king. Although he may, perhaps, give testimony, it is said to be incompatible with his dignity to appear under the process of the court. Of the many points of difference which exist between the first magistrate in England and the first magistrate of the United States, in respect to the personal dignity conferred on them by the constitutions of their respective nations, the court will only select and mention two. It is a principle of the English constitution that the king can do no wrong, that no blame can be imputed to him, that he cannot be named in debate. By the constitution of the United States, the president, as well as any other officer of the government, may be impeached, and may be removed from office on high crimes and misdemeanors. By the constitution of Great Britain, the crown is hereditary, and the monarch can never be a subject. By that of the United States, the president is elected from the mass of the people, and, on the expiration of the time for which he is elected, returns to the mass of the people again. How essentially this difference of circumstances must vary the policy of the laws of the two countries, in reference to the personal dignity of the executive chief, will be perceived by every person. In this respect the first magistrate of the Union may more properly be likened to the first magistrate of a state; at any rate, under the former Confederation; and it is not known ever to have been doubted, but that the chief magistrate of a state might be served with a subpœna ad testificandum. If, in any court of the United States, it has ever been decided that a subpœna cannot issue to the president, that decision is unknown to this court.

If, upon any principle, the president could be construed to stand exempt from the general provisions of the constitution, it would be, because his duties as chief magistrate demand his whole time for national objects. But it is apparent that this demand is not unremitting; and, if it should exist at the time when his attendance on a court is required, it would be shown on the return of the subpœna, and would rather constitute a reason for not obeying the process of the court than a reason against its being issued. In point of fact it cannot be doubted that the people of England have the same interest in the service of the executive government, that is, of the cabinet counsel, that the American people have in the service of the executive of the United States, and that their duties are as arduous and as unremitting. Yet it has never been alleged, that a subpœna might not be directed to them. It cannot be denied that to issue a subpœna to a person filling the exalted position of the chief magistrate is a duty which would be dispensed with more cheerfully than it would be performed; but, if it be a duty, the court can have no choice in the case. If, then, as is admitted by the counsel for the United States, a subpœna may issue to the president, the accused is entitled to it of course; and whatever difference may exist with respect to the power to compel the same obedience to the process, as if it had been directed to a private citizen, there exists no difference with respect to the right to obtain it. The guard, furnished to this high officer, to protect him from being harassed by vexatious and unnecessary subpœnas, is to be looked for in the conduct of a court after those subpœnas have issued; not in any circumstance which is to precede their being issued. If, in being summoned to give his personal attendance to testify, the law does not discriminate between the president and a private citizen, what foundation is there for the opinion that this difference is created by the circumstance that his testimony depends on a paper in his possession, not on facts which have come to his knowledge otherwise than by writing? The court can perceive no foundation for such an opinion. The propriety of introducing any paper into a case, as testimony, must depend on the character of the paper, not on the character of the person who holds it. A subpœna duces tecum, then, may issue to any person to whom an ordinary subpœna may issue, directing him to bring any paper of which the party praying it has a right to avail

himself as testimony; if, indeed, that be the necessary process for obtaining the view of such a paper. When this subject was suddenly introduced, the court felt some doubt concerning the propriety of directing a subpœna to the chief magistrate, and some doubt also concerning the propriety of directing any paper in his possession, not public in its nature, to be exhibited in court. The impression that the questions which might arise in consequence of such process, were more proper for discussion on the return of the process than on its issuing, was then strong on the mind of the judges; but the circumspection with which they would take any step which would in any manner relate to that high personage, prevented their yielding readily to those impressions, and induced the request that those points, if not admitted, might be argued. The result of that argument is a confirmation of the impression originally entertained. The court can perceive no legal objection to issuing a subpœna duces tecum to any person whatever, provided the case be such as to justify the process. This is said to be a motion to the discretion of the court. This is true. But a motion to its discretion is a motion, not to its inclination, but to its judgment; and its judgment is to be guided by sound legal principles. A subpœna duces tecum varies from an ordinary subpœna only in this; that a witness is summoned for the purpose of bringing with him a paper in his custody In some of our sister states whose system of jurisprudence is erected on the same foundation with our own, this process, we learn, issues of course. In this state it issues, not absolutely of course, but with leave of the court. No case, however, exists as is believed, in which the motion has been founded on an affidavit. in which it has been denied, or in which it has been opposed. It has been truly observed that the opposite party can, regularly, take no more interest in the awarding a subpœna duces tecum than in the awarding an ordinary subpœna. In either case he may object to any delay, the grant of which may be implied in granting the subpœna; but he can no more object regularly to the legal means of obtaining testimony, which exists in the papers, than in the mind of the person who may be summoned. If no inconvenience can be sustained by the opposite party, he can only oppose the motion in the character of an amicus curiæ, to prevent the court from making an improper order, or from burthening some officer by compelling an unnecessary attendance. This court would certainly be very unwilling to say that upon fair construction the constitutional and legal right to obtain its process, to compel the attendance of witnesses, does not extend to their bringing with them such papers as may be material in the defence. The literal distinction which exists between the cases is too much attenuated to be countenanced in the tribunals of a just and humane nation. If, then, the subpœna be issued without inquiry into the manner of its application, it would seem to trench on the privileges which the constitution extends to the accused; it would seem to reduce his means of defence within narrower limits than is designed by the fundamental law of our country, if an overstrained rigor should be used with respect to his right to apply for papers deemed by himself to be material. In the one case the accused is made the absolute judge of the testimony to be summoned; if, in the other, he is not a judge, absolutely for himself, his judgment ought to be controlled only so far as it is apparent that he means to exercise his privileges not really in his own defence, but for purposes which the court ought to discountenance. The court would not lend its aid to motions obviously designed to manifest disrespect to the government; but the court has no right to refuse its aid to motions for papers to which the accused may be entitled, and which may be material in his defence. These observations are made to show the nature of the discretion which may be exercised. If it be apparent that the papers are irrelative to the case, or that for state reasons they cannot be introduced into the defence, the subpœna duces tecum would be useless. But, if this be not apparent, if they may be important in the defence, if they may be safely read at the trial, would it not be a blot in the page which records the judicial proceedings of this country, if, in a case of such serious import as this, the accused should be denied the use of them? The counsel for the United States takes a very different view of the subject, and insist that a motion for process to obtain testimony should be supported by the same full and explicit proof of the nature and application of that testimony, which would be required on a motion, which would delay public justice, which would arrest the ordinary course of proceeding, or would in any other manner affect the rights of the opposite party. In favor of this position has been urged the opinion of one, whose loss as a friend and as a judge I sincerely deplore; whose worth I feel, and whose authority I shall at all times greatly respect. If his opinions were really opposed to mine, I should certainly revise, deliberately revise, the judgment I had formed; but I perceive no such opposition.

In the trials of Smith and Ogden [U. S. v. Smith, Case No. 16,342], the court in which Judge Patterson presided, required a special affidavit in support of a motion made by the counsel for the accused for a continuance and for an attachment against witnesses who had been subpœnaed and who had failed to attend. Had this requisition of a special affidavit been made as well a foundation for an attachment as for a continuance, the cases would not have been parallel, because the attachment was considered by the counsel for the prosecution merely as a means of pun-

ishing the contempt, and a court might certainly require stronger testimony to induce them to punish a contempt, than would be required to lend its aid to a party in order to procure evidence in a cause. But the proof furnished by the case is most conclusive that the special statements of the affidavit were required solely on account of the continuance. Although the counsel for the United States considered the motion for an attachment merely as a mode of punishing for contempt, the counsel for Smith and Ogden considered it as compulsory process to bring in a witness, and moved a continuance until they could have the benefit of this process. The continuance was to arrest the ordinary course of justice; and, therefore, the court required a special affidavit, showing the materiality of the testimony before this continuance could be granted. Prima facie the evidence could not apply to the case; and there was an additional reason for a special affidavit. The object of this special statement was expressly said to be for a continuance. Colden proceeded: "The present application is to put off the cause on account of the absence of witnesses, whose testimony the defendant alleges is material for his defence, and who have disobeyed the ordinary process of the court. In compliance with the intimation from the bench yesterday, the defendant has disclosed by the affidavit which I have just read, the points to which he expects the witnesses who have been summoned will testify. If the court cannot or will not issue compulsory process to bring in the witnesses who are the objects of this application, then the cause will not be postponed. Or, if it appears to the court, that the matter disclosed by the affidavit might not be given in evidence, if the witness were now here, then we cannot expect that our motion will be successful. For it would be absurd to suppose that the court will postpone the trial on account of the absence of witnesses whom they cannot compel to appear, and of whose voluntary attendance there is too much reason to despair; or, on account of the absence of witnesses who, if they were before the court, could not be heard on the trial." See the trials of Smith and Ogden. [supra]. This argument states, unequivocally, the purpose for which a special affidavit was required.

The counsel for the United States considered the subject in the same light. After exhibiting an affidavit for the purpose of showing that the witnesses could not probably possess any material information, Mr. Standford said: "It was decided by the court yesterday that it was incumbent on the defendant, in order to entitle himself to a postponement of the trial on account of the absence of these witnesses, to show in what respect they are material for his defence. It was the opinion of the court that the general affidavit, in common form, would not be sufficient for this purpose, but that the particular facts expected from the witnesses must

be disclosed in order that the court might, upon those facts, judge of the propriety of granting the postponement."

The court frequently treated the subject so as to show the opinion that the special affidavit was required only on account of the continuance; but what is conclusive on this point is, that after deciding the testimony of the witnesses to be such as could not be offered to the jury, Judge Patterson was of opinion that a rule, to show cause why an attachment should not issue, ought to be granted. He could not have required the materiality of the witness to be shown on a motion, the success of which did not, in his opinion, in any degree depend on that materiality; and which he granted after deciding the testimony to be such as the jury ought not to hear. It is, then, most apparent that the opinion of Judge Patterson has been misunderstood, and that no inference can possibly be drawn from it, opposed to the principle which has been laid down by the court. That principle will therefore be applied to the present motion.

The first paper required is the letter of General Wilkinson, which was referred to in the message of the president to congress. The application of that letter to the case is shown by the terms in which the communication was made. It is a statement of the conduct of the accused made by the person who is declared to be the essential witness against him. The order for producing this letter is opposed:

First, because it is not material to the defense. It is a principle, universally acknowledged, that a party has a right to oppose to the testimony of any witness against him, the declarations which that witness has made at other times on the same subject. If he possesses this right, he must bring forward proof of those declarations. This proof must be obtained before he knows positively what the witness will say; for if he waits until the witness has been heard at the trial, it is too late to meet him with his former declarations. Those former declarations, therefore, constitute a mass of testimony, which a party has a right to obtain by way of precaution, and the positive necessity of which can only be decided at the trial. It is with some surprise an argument was heard from the bar, insinuating that the award of a subpœna on this ground gave the countenance of the court to suspicions affecting the veracity of a witness who is to appear on the part of the United States. This observation could not have been considered. In contests of this description, the court takes no part; the court has no right to take a part. Every person may give in evidence, testimony such as is stated in this case. What would be the feelings of the prosecutor if, in this case, the accused should produce a witness completely exculpating himself, and the attorney for the United States should be arrested in his attempt to prove what the same witness had

said upon a former occasion, by a declaration from the bench that such an attempt could not be permitted, because it would imply a suspicion in the court that the witness had not spoken the truth? Respecting so unjustifiable an interposition but one opinion would be formed.

The second objection is, that the letter contains matter which ought not to be disclosed. That there may be matter, the production of which the court would not require, is certain; but, in a capital case, that the accused ought, in some form, to have the benefit of it, if it were really essential to his defence, is a position which the court would very reluctantly deny. It ought not to be believed that the department which superintends prosecutions in criminal cases, would be inclined to withhold it. What ought to be done under such circumstances presents a delicate question, the discussion of which, it is hoped, will never be rendered necessary in this country. At present it need only be said that the question does not occur at this time. There is certainly nothing before the court which shows that the letter in question contains any matter the disclosure of which would endanger the public safety. If it does contain such matter, the fact may appear before the disclosure is made. If it does contain any matter which it would be imprudent to disclose, which it is not the wish of the executive to disclose, such matter, if it be not immediately and essentially applicable to the point, will, of course, be suppressed. It is not easy to conceive that so much of the letter as relates to the conduct of the accused can be a subject of delicacy with the president. Everything of this kind, however, will have its due consideration on the return of the subpœna.

Thirdly, it has been alleged that a copy may be received instead of the original, and the act of congress has been cited in support of this proposition. This argument presupposes that the letter required is a document filed in the department of state, the reverse of which may be and most probably is the fact. Letters addressed to the president are most usually retained by himself. They do not belong to any of the departments. But, were the facts otherwise, a copy might not answer the purpose. The copy would not be superior to the original, and the original itself would not be admitted, if denied, without proof that it was in the handwriting of the witness. Suppose the case put at the bar of an indictment on this letter for a libel, and on its production it should appear not to be in the handwriting of the person indicted. Would its being deposited in the department of state make it his writing, or subject him to the consequence of having written it? Certainly not. For the purpose, then, of showing the letter to have been written by a particular person, the original must be produced, and a copy could not be admitted. On the confidential nature of this letter much has

been said at the bar, and authorities have been produced which appear to be conclusive. Had its contents been orally communicated, the person to whom the communications were made could not have excused himself from detailing them, so far as they might be deemed essential in the defence. Their being in writing gives no additional sanctity; the only difference produced by the circumstance is, that the contents of the paper must be proved by the paper itself, not by the recollection of the witness.

Much has been said about the disrespect to the chief magistrate, which is implied by this motion, and by such a decision of it as the law is believed to require. These observations will be very truly answered by the declaration that this court feels many, perhaps, peculiar motives for manifesting as guarded a respect for the chief magistrate of the Union as is compatible with its official duties. To go beyond these would exhibit a conduct which would deserve some other appellation than the term respect. It is not for the court to anticipate the event of the present prosecution. Should it terminate as is expected on the part of the United States, all those who are concerned in it should certainly regret that a paper which the accused believed to be essential to his defence, which may, for aught that now appears, be essential, had been withheld from him. I will not say, that this circumstance would, in any degree, tarnish the reputation of the government; but I will say, that it would justly tarnish the reputation of the court which had given its sanction to its being withheld. Might I be permitted to utter one sentiment, with respect to myself, it would be to deplore, most earnestly, the occasion which should compel me to look back on any part of my official conduct with so much self-reproach as I should feel, could I declare, on the information now possessed, that the accused is not entitled to the letter in question, if it should be really important to him.

The propriety of requiring the answer to this letter is more questionable. It is alleged that it most probably communicates orders showing the situation of this country with Spain, which will be important on the misdemeanor. If it contain matter not essential to the defence, and the disclosure be unpleasant to the executive, it certainly ought not to be disclosed. This is a point which will appear on the return. The demand of the orders which have been issued, and which have been, as is alleged, published in the Natchez Gazette, is by no means unusual. Such documents have often been produced in the courts of the United States and the courts of England. If they contain matter interesting to the nation, the concealment of which is required by the public safety, that matter will appear upon the return. If they do not, and are material, they may be exhibited. It is said they cannot be material, because they cannot justify any unlawful resistance which

may have been employed or meditated by the accused. Were this admitted, and were it also admitted that such resistance would amount to treason, the orders might still be material; because they might tend to weaken the endeavor to connect such overt act with any overt act of which this court may take cognizance. The court, however, is rather inclined to the opinion that the subpoena in such case ought to be directed to the head of the department in whose custody the orders are. The court must suppose that the letter of the secretary of the navy, which has been stated by the attorney for the United States, to refer the counsel for the prisoner to his legal remedy for the copies he desired, alluded to such a motion as is now made.

The affidavit on which the motion is grounded has not been noticed. It is believed that such a subpoena, as is asked, ought to issue, if there exist any reason for supposing that the testimony may be material, and ought to be admitted. It is only because the subpoena is to those who administer the government of this country, that such an affidavit was required as would furnish probable cause to believe that the testimony was desired for the real purposes of defence, and not for such as this court will forever discountenance.