**UNITED STATES of America**

v.

**John M. POINDEXTER.**

**Cr. No. 88–0080–01 (HHG).**

United States District Court,
District of Columbia.

Feb. 5, 1990.

See also 732 F.Supp. 135.

would thereafter make a final decision with respect to enforcement of the subpoena.

Howard M. Pearl, Office of the Independent Counsel, Washington, D.C., for prosecution.

Richard W. Beckler, Joseph T. Small, Jr., Stephen M. McNabb, Frederick Robinson and Michael G. McGovern, Fulbright & Jaworski, Washington, D.C., for defendant John M. Poindexter.

Theodore B. Olson, John A. Mintz, Michael B. Rappaport and Julia A. Dahlberg, Gibson, Dunn & Crutcher, Washington, D.C., for former President Ronald W. Reagan.

David Anderson, James S. Reynolds, Thomas Millet and Douglas Letter, U.S. Dept. of Justice, Washington, D.C., for the U.S. and Archivist of the U.S.

## OPINION

HAROLD H. GREENE, District Judge.

The Court is called upon to decide whether, under the Constitution and laws, former President Ronald Reagan may be subpoenaed to testify as a witness for the defense in the criminal trial of his erstwhile National Security Advisor John Poindexter. Related to that issue is the question whether a sufficient factual showing has been made by the defendant to cause the Court to order the subpoena served, and if the answer to that question is in the affirmative, in what form President Reagan's testimony should be given.

### I

### Background and History

Defendant has petitioned the Court to allow him to serve former President Reagan with a subpoena to compel his attendance and testimony at the trial of this case.[1] Following the receipt of defendant's

Lawrence E. Walsh, Independent Counsel, Dan K. Webb, Louise R. Radin, Associate Counsel, Christian (Chris) J. Mixter,

---

1. On November 3, 1989, defendant petitioned for leave to serve a subpoena duces tecum et ad testificandum on former President Reagan, with an attachment requesting information in sixty-seven categories. Given that these categories were structured for document production, rather than for questions to a witness, the Court did not construe this November 3, 1989 subpoena as a request for Mr. Reagan's appearance at trial, and it went on to consider the issue of the subpoena duces tecum as a separate matter. Following *in camera* inspection of President

Reagan's diaries, the Court determined that defendant was entitled to certain diary entries, directed President Reagan to turn these excerpts over to defendant, and quashed the remainder of the subpoena.

On December 18, 1989, defendant filed a separate petition for leave to serve former President Reagan with a subpoena ad testificandum, in which defendant again relied on the sixty-seven categories identified in the original subpoena and a September 18, 1989 *ex parte* filing. As

petition, the former President and the Department of Justice (representing the incumbent President)[2] filed papers opposing service of the subpoena.[3] The Court considered briefs of the parties, and it held a hearing on the subpoena issues on January 23, 1990.[4] At the conclusion of that hearing, the Court directed defendant to file with the Court and to serve on counsel for the former and for the incumbent President a statement of the precise questions he proposes to ask President Reagan, and both the former and the incumbent President were given the opportunity to respond to that statement. *See* Part III, *infra.*[5]

A number of legal and factual issues are implicated by the matter before the Court. In view of the extraordinary nature of the request for the compelled testimony of a former President, and the parties' widely divergent views concerning the history of prior efforts to require sitting or former Presidents to testify, it is useful first to recapitulate and analyze that history.

Counsel for President Reagan and the Department of Justice contend that defendant is requesting the issuance of an order that "no other federal judge has issued in the history of our Republic: defendant urges this Court to compel a recent former President to appear and testify at a trial on matters concerning the conduct of his Presidency."[6] Defendant, on the other hand, claims that what he seeks here is "not unprecedented," in that several American Presidents and former Presidents have given testimony under oath in judicial or qua-

si-judicial proceedings.[7] At least in a technical sense, both sides are correct.

History records less than a dozen instances of testimony of Presidents of the United States in judicial or congressional proceedings in two hundred years of American history.[8] For purposes of the issue before the Court, that history may be divided into three segments: relatively ambiguous events early in the history of the Republic; testimony before congressional bodies between 1846 and 1912; and the most recent practice, beginning with Watergate.

1. The first, and one of the most famous, controversies surrounding an effort to compel a President to testify occurred in the treason trial of former Vice President Aaron Burr in 1807. *United States v. Burr,* 25 F.Cas. 30 (No. 14,692d) (C.C.Va. 1807). Burr initially intended to issue a subpoena duces tecum to President Jefferson for the production of a letter and other papers from General James Wilkinson which allegedly contained instructions to the Army and the Navy "to destroy" his person and property. Counsel for the government contended that a general subpoena for the attendance of the President could issue, but not a subpoena duces tecum. According to counsel for Burr, on the other hand, the personal attendance of the President could be dispensed with if the documents were produced. In response to these arguments Chief Justice Marshall stated that

discussed in the text below, this was followed by a direction by the Court for more specificity regarding the areas on which defendant wishes to examine the former President.

The Court early on rejected defendant's demand for the appearance of President George Bush, October 24, 1989 Opinion, 725 F.Supp. 13, at 30–31, and defendant has not renewed it.

**2.** *See* 28 U.S.C. §§ 516, 517.

**3.** *See Nixon v. Administrator of General Services,* 433 U.S. 425, 448–49, 97 S.Ct. 2777, 2792–93, 53 L.Ed.2d 867 (1977); *Nixon v. Freeman,* 670 F.2d 346, 356 (D.C.Cir.1982); *Public Citizen v. Burke,* 843 F.2d 1473, 1478–79 (D.C.Cir.1988).

**4.** The Court has considered these proceedings as the equivalent of those involving a motion to quash.

**5.** Pursuant to an order of this Court, both the proposed list of questions and the memoranda addressing these questions were not served on the prosecutor, the Independent Counsel, or made public.

**6.** Department of Justice Memorandum at 1; *see also,* Reagan Memorandum at 1.

**7.** Defendant's Memorandum at 10.

**8.** The circumstances of such testimony have differed widely: sometimes it was provided voluntarily, on other occasions it was given in response to compulsion; sometimes it was given not in open court but in depositions; and in still other instances evidence was provided by way of answers to interrogatories.

in the provisions of the constitution, and of the statute, which give the accused the right to compulsory process, there is no exception whatever ... and it is not known ever to have been doubted, but that the chief magistrate of a state might be served with a subpoena ad testificandum.

*Burr* at 34.[9] The subpoena was consequently issued, and President Jefferson's Attorney General produced portions of the letters and other papers. Jefferson also agreed to testify at a deposition in order to avoid the administrative inconvenience of a personal appearance at trial. *Id.* at 69.

A similar plea of administrative inconvenience by a sitting President was that of James Monroe in 1818 in response to a summons to testify at a court-martial on behalf of the defendant.[10] Initially President Monroe, too, suggested the alternative of a deposition, but the parties ultimately agreed on answers to written interrogatories. President Ulysses S. Grant voluntarily gave deposition testimony on behalf of the defense in the criminal fraud trial of his confidential secretary.

2. John Tyler was subpoenaed by and testified before a congressional committee in connection with its investigation of disbursements by then Secretary of State Daniel Webster for clandestine operations relating to foreign affairs, and John Quincy Adams filed a deposition in the same matter. Abraham Lincoln likewise testified voluntarily at a congressional hearing (the committee was investigating alleged leaks to the press by Mrs. Lincoln), and Theodore Roosevelt twice testified without compulsion before congressional committees regarding his campaign finances and a steel company acquisition at a time when he was an ex-President.

3. In the context of the Watergate affair, President Richard Nixon was subpoenaed both by the prosecution and by the defense in the ensuing criminal trial of some of his appointees, but the President was ultimately excused on account of his ill health. *United States v. Mitchell*, 385 F.Supp. 1190 (D.D.C.1974), *aff'd sub nom. Maryland v. Haldeman*, 559 F.2d 31, 80–81 (D.C.Cir.1976) (en banc). However, President Nixon was deposed pursuant to judicial process in connection with several civil actions.[11] President Gerald Ford testified under compulsion by videotaped deposition in the criminal trial of Lynette Fromme who sought to assassinate him,[12] and he also provided testimony before a congressional committee regarding his pardon of Richard Nixon. Finally, President Jimmy Carter, while in office, provided videotaped depositions in the criminal trial of State Senator Culver Kidd and Sheriff Buford T. Lingold on gambling conspiracy charges, and for a grand jury investigation of an alleged White House attempt to quash extradition proceedings against an international fugitive.[13]

---

**9.** Justice Marshall reasoned that, given that the President could be summoned to testify, he could also be required to bring those papers which might be material to the defense. *Id.* at 34–35.

The Marshall directions were issued notwithstanding that two of the framers of the Constitution—John Adams and Oliver Ellsworth—believed that "the President, personally, was not the subject of any process whatever...." *Nixon v. Fitzgerald*, 457 U.S. 731, 751 n. 31, 102 S.Ct. 2690, 2701 n. 31, 73 L.Ed.2d 349 (1982).

**10.** Attorney General Wirt advised Mr. Monroe that a subpoena ad testificandum could properly be "awarded" to the President. Rotunda, *Presidents and Ex-Presidents as Witnesses: A Brief Historical Footnote*, U. of Ill.Law.Forum 1, 5 (1975). The Rotunda article is also the source for the subsequent history of Presidential testimony. *See also, Nixon v. Sirica*, 487 F.2d 700, 710 (D.C.Cir.1973).

**11.** *See Nixon v. Fitzgerald, supra,* 457 U.S. at 735 n. 5, 102 S.Ct. at 2693 n. 5; *Halperin v. Kissinger,* 401 F.Supp. 272, 274 n. 1 (D.D.C.1975).

**12.** *United States v. Fromme,* 405 F.Supp. 578 (E.D.Cal.1975).

**13.** In addition to situations involving live Presidential testimony, courts have enforced subpoenas duces tecum, including those for the tapes of Presidential conversations. *See United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) (government subpoena duces tecum enforced over incumbent President's claim of executive privilege); *see also, Dellums v. Powell,* 561 F.2d 242 (D.C.Cir.1977) (subpoena duces tecum enforced in a class action against former Attorney General Mitchell).

■ What this history indicates is that courts may and have required former as well as incumbent Presidents to testify in appropriate cases, but that these courts have also sought to exercise this power in a way that would be least damaging to the Presidency or onerous to the particular individual occupying the Office, to the extent that this was possible and consistent with the rights of the litigant who was in need of such testimony.

In any event, any question as to the power of a court to require a President to testify was laid to rest in *United States v. Nixon,* 418 U.S. 683, 713, 94 S.Ct. 3090, 3110, 41 L.Ed.2d 1039 (1974), where the Supreme Court decided that "when the ground for asserting privilege as to subpoenaed materials sought for use in a criminal trial is based only on the generalized interest in confidentiality, it cannot prevail over the fundamental demands of due process of law in the fair administration of criminal justice. The generalized assertion of privilege must yield to the demonstrated, specific need for evidence in a pending criminal trial." *See also, Marbury v. Madison,* 1 Cranch 137, 2 L.Ed. 60 (1803).

## II

### *Standard to Be Applied*

Since it is settled that a President, whether former or incumbent, may be sub-

poenaed to be a witness in judicial proceedings in an appropriate case, the next question is what standard should be applied in deciding whether in the instant case defendant's subpoena for President Reagan should be honored, considering *inter alia,* the fact that no claim of executive privilege has been advanced.[14]

■ Defendant argues that a claim of executive privilege is an absolute prerequisite to a deviation from the standard applied to witnesses generally. In the absence of a privilege claim, it is said, the President is with respect to a subpoena like any other citizen. As discussed below, that position is not well taken.

■ Equally erroneous is the argument of counsel for former President Reagan and Department of Justice counsel acting on behalf of President George Bush (hereinafter at times referred to collectively as the "Reagan–Justice Counsel"). Reagan–Justice Counsel assert that, in addition to showings of relevancy, materiality, and other incidents of admissibility, defendant is required to demonstrate that the testimony of the former President will be central to his defense, and that a substitute from any other source would be inadequate.[15] However, the precedents cited for this proposition do not support it.[16] The pro-

---

**14.** That is not to say that a claim of executive privilege excuses a President from testifying; the *Nixon* decision holds that it does not. But such a claim does place a higher burden on the litigant who seeks a President's testimony.

**15.** Reagan Memorandum at 4, 25.

**16.** Reagan–Justice Counsel rely almost exclusively upon *United States v. Haldeman,* 559 F.2d 31 (D.C.Cir.1976), *United States v. Ehrlichman,* 546 F.2d 910 (D.C.Cir.1976), and *United States v. Nixon, supra.* However, none of these decisions supports their argument.

In *Haldeman,* the Court of Appeals stated in the context of the denial of a request for a continuance of the trial that, with respect to discovery demands on the President by one of the defendants, "nothing less than a 'demonstrated, specific need for evidence in a pending criminal trial' could carry th[e] burden." 559 F.2d at 76–77. This language is not only less compelling than the vastly inflated claims that are made here based thereon, but it was employed in a wholly different fact situation—a

continuance and a hardly concealed exasperation of the court with defendant's repeated, sweeping, broadly phrased endeavors to secure a "tremendous array of materials." 559 F.2d at 74–77, 84.

Likewise, in *Ehrlichman,* while the Court of Appeals said that a subpoena for a President may only be enforced "where there is a 'demonstrated specific need' for the testimony *or* the testimony is essential to the justice of the [pending criminal] case" (emphasis added), here again, Mr. Ehrlichman appears to have taxed the patience of the court with his broad demands. Moreover, the court relied on *United States v. Nixon* in which as indicated *infra,* executive privilege had been asserted. 546 F.2d at 933–34 n. 103. In any event, the Court of Appeals did no more than to uphold the decision of the trial judge who decided, in the exercise of his discretion, not to compel the appearance of the then-incumbent President Nixon as a witness.

As for *United States v. Nixon, supra,* which is the modern fountainhead of the law on the

posed standard would be extraordinary even in a case where executive privilege has been invoked; it is particularly so in a non-privilege situation. Moreover, if the argument were correct, it would be as easy, or as difficult, to subpoena a President who had claimed executive privilege as one who had not.[17] That is not the law.

As for the broader dispute between the parties, here again, history and the precedents do not teach an unambiguous lesson. In *Nixon v. Sirica,* 487 F.2d 700, 711 (D.C. Cir.1973), the Court of Appeals stated that "[t]he Constitution makes no mention of special presidential immunities. Indeed, the Executive Branch generally is afforded none. This silence cannot be ascribed to an oversight...." Likewise, in *Burr,* Chief Justice Marshall noted that "the propriety of introducing any paper into a case, as testimony, must depend on the character of the paper, not on the character of the person who holds it." 25 F.Cas. at 34.

On the other hand, in *United States v. Nixon,* 418 U.S. at 702, 94 S.Ct. at 3104, the Court stated [18] that in the instance of a President, appellate review—and thus presumably also trial court action—should be particularly meticulous, in deference to a coordinate branch of government, to en-

sure that the standards of Rule 17(c) have been correctly applied. Moreover, whatever may be said about the undue breadth that the Reagan–Justice Counsel ascribe to them, *see* note 16, *supra,* the *Haldeman* and *Ehrlichman* decisions do imply that a subpoena to an incumbent or a former President should be scrutinized with a sharper eye and held to a higher standard than one to an ordinary citizen.[19]

■ Although support for the position advocated by the Reagan–Justice Counsel is thus far from overwhelming, indeed relatively sparse, the Court will apply a rule that is sympathetic to President Reagan's position. While the former President has not claimed executive privilege, he will only be compelled to testify at the trial of this case if the Court is satisfied that his testimony would be material as tested by a meticulous standard,[20] as well as being necessary in the sense of being a more logical and more persuasive source of evidence than alternatives that might be suggested.[21] The Court will do so essentially for two reasons.

First, Reagan–Justice Counsel are justified in their observation that future Presi-

subject, it held that an *incumbent* President who has *raised a valid claim of executive privilege* may be required to give evidence only if that evidence is "essential to the justice of the [pending criminal] case." 418 U.S. at 713, 94 S.Ct. 3110, citing *United States v. Burr,* 25 F.Cas. at 192. The Court made it very clear that this standard was to be employed by a court only "[u]pon receiving a claim of privilege from the Chief Executive." *Id. See also, United States v. Reynolds,* 345 U.S. 1, 7–8, 73 S.Ct. 528, 531–32, 97 L.Ed. 727 (1953); *Nixon v. Freeman, supra,* 670 F.2d at 359, *Public Citizen v. Burke, supra.*

In short, no decision supports the Reagan–Justice flat and unqualified contention that a defendant may compel a former President to provide plainly material testimony only if he also demonstrates that the Presidential evidence is central to his defense and is not available except from the President.

17. One cannot easily conjure up preconditions to Presidential testimony that could be added in an executive privilege context to those which Reagan–Justice Counsel claim for the situation where no such privilege claim has been made.

18. In that case, the President had claimed both executive privilege and administrative inconvenience as obstacles to any requirement that he

testify, and any references to the situation of a President in a more general sense, that is, to one who had not asserted executive privilege, may be regarded as dictum.

19. *See also, United States v. North,* 713 F.Supp. 1448, 1449 (D.D.C.1989), where Judge Gesell said that the compelled appearance of a former President as a witness at a criminal trial must be justified by a "sufficient showing ... that the former President's testimony is essential to assure the defendant a fair trial."

20. Even Cabinet-level officers may not be subpoenaed to testify unless the relevance of their testimony is demonstrated in advance. *See, e.g., May v. United States,* 175 F.2d 994, 1010 (D.C. Cir.1949); *Freeman v. Seligson,* 405 F.2d 1326, 1338 (D.C.Cir.1968).

21. As discussed below, Reagan–Justice Counsel argue that the President's evidence may be deemed necessary only if no other source of that evidence, no matter how implausible, exists or could be located. The Court rejects that extreme position.

dents and their advisors might be substantially inhibited in their deliberations if they knew that, absent the properly rare and extraordinary invocation of executive privilege (*see* p. 148, *infra*), the President could subsequently be compelled to testify with frequency and for non-essential or relatively trivial reasons. *See Nixon*, 418 U.S. at 708, 715, 94 S.Ct. at 3111. The Court's decision herein will take account of that legitimate consideration.

Second, application of a rule absolutely requiring a claim of executive privilege at this stage as a prerequisite to judicial care in evaluating the subpoena would make little practical sense under the facts of this case. Since the defendant associated with President Reagan in several different contexts and had discussions with him on many different topics, it is conceivable that, with respect to some of these associations and discussions, a claim of privilege could validly be made, while with regard to others the claim would be unsound.[22] In view of that situation, it would hardly do to require the former President to claim executive privilege with respect to the entire inquiry (even as to questions to which it would not properly apply) or be deemed to have waived it altogether. This is so particularly since, as the Supreme Court has instructed, executive privilege should not "be lightly invoked." *United States v. Reynolds*, 345 U.S. 1, 7, 73 S.Ct. 528, 531, 97 L.Ed. 727 (1953).

## III

### *Defendant Has Made the Requisite Showing*

In order to facilitate a meticulous review of the subpoena, the Court has required the defendant to submit a list of the specific questions he wishes to ask the former President, and to serve copies of these questions on the former President and the Department of Justice acting on behalf of the incumbent President, so as to afford them the opportunity to litigate whether the defendant's showing is adequate.[23]

In accordance with the Court's directions for specificity, defendant has submitted 183 questions which he proposes to ask the former President. The areas covered by these questions include the following: (1) the frequency with which and the occasions on which President Reagan met alone with defendant; (2) the President's understanding of the Boland Amendment as ap-

---

**22.** This may be analogized to a hypothetical situation of a traffic accident involving the President's driver while a foreign dignitary or an intelligence official carrying highly sensitive papers was sharing the ride with the President. Executive privilege might be appropriate with respect to some lines of inquiry in a criminal or civil suit arising out of the accident but not to others.

**23.** It has been a principal point made both by counsel for President Reagan and by the Department of Justice that the Court should not decide the issue of Presidential testimony on defendant's *ex parte* submission alone, but should allow them to examine and respond to these submissions. According to President Reagan, "[a]bsent a demonstration in the crucible of the adversarial process that, as the defendant expressly represents, the former President has 'valuable testimony which no other witness can provide' … neither the Court nor the former President can determine whether the subpoena *ad testificandum* is essential to justice in this case." Reagan Memorandum at 4. If this is to be taken to mean that it will be helpful to the former President to have an advance list of the questions and an opportunity to persuade the Court that the questions are not designed to ferret out legitimate evidence, the point is well taken, and the Court has ordered its implementation.

However, to the extent that this contention may be designed to convey the impression that a mini-trial must be held in advance of the regular trial to litigate the substance and the validity of the Poindexter defense, it is plainly wrong, given Poindexter's status as a defendant clothed with the presumption of innocence. It does not appear that any court has ever gone as far as this Court did in this case—to require a precise listing of all the primary questions that will be asked of the President, and to permit the President's lawyers to litigate on their validity. However, there is not the slightest basis in law, precedent, or logic for Reagan-Justice Counsel's suggestion that the defendant must additionally be required to supply the answers Mr. Reagan will give in response to these questions, and that these counsel are then entitled to test the substance and weight of the answers by "the crucible of the adversarial process," that is, by a trial in advance of the real trial. Such a procedure would constitute an extraordinary invasion of defendant's due process rights.

plied to support for the Contras;[24] (3) whether the President authorized defendant to discuss with representatives of foreign countries the provision of support for the Contras' military and paramilitary activities; (4) what instructions the President gave to defendant regarding his meetings with United States allies in Central America, and what briefing defendant provided to the President upon his return; (5) discussions the President had with various Central American leaders concerning support for the Contras; (6) discussions of the President with the defendant regarding actions to be taken if Congress did not authorize continued aid for the Contras' military activities; (7) the President's knowledge regarding the relationship of Oliver North with specific individuals involved in Iran-contra activities, and the details of his own actions in support of the Contras; (8) defendant's briefing of the President, on several occasions, regarding a proposed House of Representatives resolution of inquiry, and the position of the Administration with respect thereto;[25] (9) defendant's commu-

nications with congressional committees at the instruction of the President;[26] (10) whether defendant informed the President of the status of General Secord; (11) discussions the President had with defendant regarding the chronology referred to in Counts One and Two of the indictment; and (12) the state of the President's knowledge regarding the shipment of missiles to Iran.

The Court finds—indeed no one could seriously deny—that questions dealing with subjects such as these seek material evidence, that is, important information directly related to the charges in the indictment and to Poindexter's anticipated defenses to these charges.[27] Moreover, the questions relate, *inter alia*, to circumstances where former President Reagan and the defendant were obviously the only persons present during a particular exchange;[28] where one addressed the other on a significant subject; and where a subject directly material to a charge or a defense was discussed by or in the presence of both men.[29]

24. One question along this line asks whether it was the President's view "that the Boland Amendment did not prohibit efforts by [the President] or members of the NSC staff to obtain financial and other support for the Contras' military and paramilitary activities."

25. That is the resolution of inquiry referred to in Counts One and Two of the indictment. One of defendant's proposed questions with respect thereto asks, "Did you advise Admiral Poindexter that the responses to the congressional letters should state the Administration's opposition to the proposed resolution of inquiry?"

26. One of the questions reads as follows: "Did you advise Admiral Poindexter to inform the congressional committees that the information sought by the proposed resolution had already been provided to them and that this information made it clear that the actions of the NSC staff were in compliance with the law?"

27. The Court has inspected but not released the defendant's *ex parte* filing of his defenses as a protection to defendant's fair trial rights. However, in view of the submissions defendant has made since then—those supporting his discovery requests, those which relate to his request for the President's diaries, his filings pursuant to CIPA, and the filings made in support of the subpoena presently before the Court—the shape of the defense theories has inevitably become apparent to the other parties.

28. Reagan–Justice Counsel have submitted an affidavit of one John A. Mintz who claims, based upon his review of records and interviews with government employees, that defendant only rarely met with President Reagan on a one-to-one basis. Poindexter categorically disputes this conclusion, and he supplies details which cast serious doubts on the accuracy of the Mintz document. Defendant's Reply Memorandum at 12. By contrast to the Poindexter version, the Mintz declaration is hearsay only (*see* Rules 602 and 802, Fed.R.Evid.) and not even reliable hearsay, for it identifies none of the persons interviewed and only one of the documents he consulted.

29. Department of Justice counsel state that "[q]uite surprisingly ... none of the 183 proposed questions directly references the substance of any private meeting between defendant and President Reagan." Justice Memorandum at 5. Aside from the fact that many of the questions do indicate quite plainly both the one-on-one character of meetings and their substance, there is no basis for the assumption that defendant is restricted to questioning the former President about events at which no one else was present. *See, e.g., United States v. Fromme,* note 12, *supra* (President Ford required to give videotaped deposition about assassination attempt notwithstanding that it was perpetrated amidst a crowd of people); and discussion of this issue, *see* pp. 152–153, *infra.*

■ None of this should be taken to mean that all the questions listed by defendant are appropriate. The Court has considered memoranda from the former President and the Department of Justice challenging a number of the questions on various grounds. Based upon these papers, as well as on a reply memorandum submitted by defendant, the Court has concluded that some of the objections are well taken, and it has therefore decided to order a number of questions stricken, as follows.

Several questions are designed to elicit answers with no relevancy to the issues or only very marginal relevancy. These include one question (No. 5) which requests an answer regarding a general method of communication used between defendant and the President; three questions (Nos. 43–45) on the possible identification of and a meeting with a foreign official with neither the identification nor the meeting being material to any issue; three questions (Nos. 73–75) concerning a meeting between President Reagan and CIA Director Casey the substance of which the Court previously struck from the subpoena duces tecum; two questions (Nos. 78–79) dealing with recommendations made by individuals other than the President whose identity and the substance of whose evidence are clearly known to defendant; six questions (Nos. 100–05) which deal with a largely irrelevant meeting and various newspaper articles; and three questions (Nos. 181–83) the materiality of which is obscure at best.

Further, two questions (Nos. 12–13) are unduly broad, particularly in light of a narrower, more pertinent question (No. 19) which the Court allows; six questions (Nos. 86–88, 90–92) deal with support for non-military activities of the Contras, a subject the Court has previously held to be too tangential for evidentiary use; and three questions (Nos. 159–61) which are at best follow-up questions of significance only depending on the answers to other, earlier questions. These twenty-nine questions are accordingly stricken for the reasons indicated.

Other Reagan–Justice Counsel objections based upon an alleged lack of relevancy and materiality are not well taken. For example, counsel claim that questions concerning the President's knowledge of defendant's allegedly illegal or concealed activities would not produce material evidence.[30] Although defendant might not have a valid defense based directly on the claim that his illegal activities, if any, were known to the President, the fact of the President's knowledge of, and apparent acquiescence in, such activities—if that is what occurred[31]—would be material evidence, for it would bear on defendant's specific intent to commit various offenses.

Similarly, some of defendant's questions appear to be designed to bring out that President Reagan shared his view that the Boland Amendment did not prohibit the activities of the National Security Council staff at issue in the indictment. The Court rejects the Reagan–Justice contention that defendant easily could and therefore should substitute other evidence for expressions by the President himself in that respect. The President was Poindexter's superior and the official who made the policy for the Executive Branch of government (including the National Security Council), and his determination as to what his subordinates in the White House could or should do in light of this legislation had obviously paramount weight.

## IV

### *Conditions Demanded by Counsel for President Reagan and the Department of Justice*

■ Reagan–Justice Counsel further argue[32] that all or almost all the areas of inquiry described by defendant should be rejected on various broad or generic grounds. These contentions are discussed below.

---

**30.** Reagan Memorandum at 10.

**31.** The Court obviously does not know and makes no judgment as to what the President's testimony will actually show in this respect.

**32.** Reagan Memorandum at 1; Department of Justice Memorandum at 3–4.

First.[33] Counsel claim that the evidence sought by many of the questions "could easily be made the subject of stipulations between defendant and the Independent Counsel."[34] Notwithstanding that the Court had some doubt, when the issue was first raised, that the prosecution and the defense would be able to stipulate on the subjects surrounding Mr. Reagan's proposed testimony because of their significance to both sides, it issued an order on January 24, 1990, requiring the Independent Counsel and the defendant to "endeavor to limit or to obviate the need for former President Reagan's testimony by way of stipulations between the parties, to the extent that they believe they are able to do so consistently with the legal rights of the parties involved." On January 30, 1990, the parties submitted individual letters to the Court, stating that, after having explored the subject, they had concluded that there was no possibility that stipulations could be agreed to between them. That, of course, ends the matter.[35]

Second. Counsel for the former President argue next, and at considerable length, that defendant does not need the Reagan evidence because the claims which underlie many of the questions "may be undermined by his own sworn testimony" before the congressional committees.[36] There is, if anything, even less merit to this argument than there is to the stipulation point, for there is a short and conclusive answer to the claim that defendant's congressional testimony somehow bars the effort to subpoena the former President—Poindexter's testimony in Congress was given under a grant of immunity, and under the Fifth Amendment that testimony cannot be used against him for any purpose. *United States v. Kastigar*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).

In a lengthy Opinion handed down on December 19, 1989, the Court explored the *Kastigar* issues in detail in the context of this case, and it concluded that defendant is entitled to be free from being confronted with evidence which stems, in one form or another, from the testimony he gave at the immunized proceeding before the congressional committees. Opinion at 7. Under the plan of Reagan–Justice Counsel, defendant would, of course, be directly confronted with that immunized testimony.[37]

The argument is not well taken entirely apart from this insuperable constitutional obstacle. Even if some statements made by defendant in his congressional testimony were to be inconsistent with the evidence he seeks to elicit from President Reagan—an issue the Court does not decide—this would not be an impediment to defendant's effort to support his defense

**33.** In addition to the categories discussed in the text, Reagan–Justice Counsel object to questions which are mere foundation questions, laying the background for defendant's more important substantive queries. An erasure of the foundation questions, as counsel urge, would leave the examination both disjointed and confusing. Not only has no precedential basis been provided for this question-by-question analysis, but no legal support has been offered for the proposition that defendant's questions must be limited to an irreducible minimum. Under the Reagan–Justice theory, defendant would not be entitled to ask the witness his name.

**34.** Reagan Memorandum at 4; Department of Justice Memorandum at 2.

**35.** Reagan–Justice Counsel see a parallel here with the stipulations that have been agreed to both in this and other cases under the Classified Information Procedures Act (CIPA), 18 U.S.C. App. IV sec. 6. However, under CIPA, the parties are required *by statute* to agree on substitutions when highly sensitive security information is proffered for admission into evidence. Not only does a statute stand behind the inducement to stipulate in that situation, while nothing comparable is present here, but additionally CIPA provides that a defendant who fails to agree on the requisite substitutions, including stipulations, may lose the right to use the evidence altogether; and the prosecution, should it refuse to back down with respect to some documents, is subject to penalties, including dismissal of the charges. Such inducements do not exist in the instant situation, and a court could not, without statutory authority, require a defendant in a criminal case to stipulate away all or part of his defense.

**36.** Reagan Memorandum at 12–16, and affidavit of John A. Mintz at 3–17.

**37.** It is settled law that such testimony may not be used to impeach or contradict at any subsequent proceeding. *United States v. Apfelbaum*, 584 F.2d 1264 (3rd Cir.1978), and cases cited therein; *United States v. Tormos–Vega*, 656 F.Supp. 1525 (D. Puerto Rico 1987).

by use of the Reagan evidence. The Court is not aware of any legal principle, and counsel for the former President have cited none, that would preclude an accused in a criminal trial to seek to contradict or impeach his pretrial statements, much less a principle that would prevent such an accused from subpoenaing witnesses to support his current version of the events. The Court is aware, however, of hundreds of situations and rulings to the contrary; *e.g.*, where a defendant makes a confession and subsequently seeks to produce testimony to the effect that the events themselves were at odds with those described in that confession. Indeed, virtually the entirety of the constitutional law of confessions is comprised of such cases. No court appears ever to have held that such evidence is not admissible, and again the former President cites no such holding.

Third. Counsel for President Reagan argue next that defendant has no special need for the former President's testimony to establish his alleged belief in the legality of the activities of the National Security Council, suggesting that defendant "might have been expected to seek legal advice from lawyers, not the President." [38] It is plainly not unreasonable for the defendant to seek out evidence with which he might hope to persuade a jury that he lacked specific intent, at least in part, because the President expressed his belief that what Poindexter did was lawful—assuming that the President did, in fact, express such a belief. It borders on the frivolous to suggest that a lawyer's opinion would be more pertinent on that issue than that of the President of the United States.

Fourth. Reagan–Justice Counsel argue that, even if defendant was present at a meeting with President Reagan, and the President made statements that would be helpful to the defense, defendant is not entitled to elicit that evidence from the former President because other persons may have also been present. In that view, defendant could call the former President to the stand on such an issue only if he first established affirmatively that the defense could not possibly prove any particular proposition through the testimony of other participants. There are several problems with that argument.

There has been no showing that the hypothetical advanced by the Reagan–Justice Counsel has any basis in fact, for counsel have not submitted affidavits indicating who else was present at what meeting; whether these individuals were there when particular statements or decisions were made; whether these persons would be prepared to testify; and to what they would testify. All that Reagan–Justice Counsel assert is that a number of defendant's questions involve meetings or conversations that "could have occurred" with other persons present, and that information is being sought that "could be supplied" by sources other than the former President. [39] There is no precedent which would cast on the defendant in a criminal case the burden to explore and overcome these negative suppositions. It would, indeed, be a gross violation of the due process rights of this defendant to deprive him of needed and available testimony based on such speculations.

Beyond that, President Reagan may be presumed to have been the presiding officer at all meetings at the White House, and he is therefore the most appropriate evidentiary source to the events that occurred at these meetings. The former President was also the person who issued whatever instructions that were issued, and he made the decisions [40] before, during, and after the meetings, and on that basis he is, again, by far the most logical and competent witness as to what occurred, as distin-

---

**38.** Reagan Memorandum at 24.

**39.** Reagan Memorandum at 7.

**40.** In that respect, President Reagan was probably not unlike President Lincoln of whom it is said that when he polled his Cabinet and heard all the members say "nay," he announced—"The vote has been taken; the ayes have it." *The Christian Science Monitor,* February 22, 1980 at p. 23.

guished from a participant who most likely could only contribute hearsay.[41]

President Reagan was also the defendant's direct superior, and the two men would be the most likely persons both to have knowledge of what preceded any such conference (in terms of agenda, attendees, expected outcome, and the like) and what instructions were given following the conference on how to implement what had been discussed. In view of that circumstance, President Reagan would in any event be the only appropriate witness with respect to these one-on-one preparatory and follow-up meetings.

Fifth. The Department of Justice, but not counsel for President Reagan, expresses notable pessimism that the former President could be questioned on any basis, indicating that, "even after the CIPA process is concluded, defendant's questioning will doubtless push to the limit any classifica-tion boundaries set under CIPA and the prospect of a President, who sits at the apex of the classification pyramid, being cross-examined in such a manner raises serious difficulties."[42] Since the Department has not identified any particular question as being in that category, this sweeping conclusion—proclaimed by the Department in advance of, and without the benefit of, any examination of the CIPA issues through the statutory process and by the personnel who customarily participate in that process[43]—is disquieting. The Court expects that all parties will deal with the issues in good faith.

For all these reasons, the Court now[44] holds that a sufficient prima facie showing has been made that the former President's testimony will be material to the issues in this case and admissible under a meticulous scrutiny and necessity standard. *See* p. 147, *supra.*

41. There can be no doubt that, should defendant bring to the witness stand some other, lesser official, the prosecution could argue with telling effect, and the jury might well conclude, that the evidence is weak or defective because the decision-maker himself was absent.

42. Department of Justice Memorandum at 4 n. 3.

43. Contrary to what some had assumed, the actual CIPA process in this case, propelled by the genuine effort made by all concerned—defendant, Independent Counsel, and the government's staff of professional security specialists—has gone well and thus far without significant difficulty.

44. The Court rejects the requests of the former President and of the Department of Justice that it postpone review of the requirement for President Reagan's testimony until after the prosecution has completed its case-in-chief. The only direct precedential support for this demand is Judge Gesell's decision in *United States v. North,* 713 F.Supp. 1448 (D.D.C.1989). However, since Oliver North never or hardly ever conferred with the President on a one-to-one basis as did Poindexter with regularity, the likelihood of President Reagan's testimony being compelled was always remote, and nothing was lost by a delay. Here, however, the situation is quite different in that regard.

To deprive the defendant of the knowledge whether President Reagan will be a witness on his behalf will make it difficult, if not impossi-ble, for defendant to formulate and implement a coherent trial strategy. From the jury voir dire and the opening statement on, the choices of defendant's counsel will be profoundly influenced by the knowledge of whether or not President Reagan will testify. To require counsel, for example, to make an opening statement that omits any reference to President Reagan even though Mr. Reagan ultimately appeared and perhaps gave crucial testimony, would unnecessarily undermine the credibility of defense counsel insofar as the jury was concerned, and, by association, that of the defendant. On the jury voir dire, too, counsel may be unable to ascertain whether members of the jury pool have any strong views regarding Mr. Reagan, as long the issue of the former President's testimony is unsettled.

Additionally, a decision on this issue in the midst of trial, as the Reagan and Justice Department lawyers suggest, would require a continuance at that juncture to permit briefing of the legal and factual issues, the possible summoning of the former President, and preparation for his examination by counsel. Severely truncated trial proceedings would accordingly ensue. Furthermore, since President Reagan, the incumbent President, or both, may have a right to take an interlocutory appeal from an adverse decision by this Court regarding any claim of executive privilege, *Nixon,* 418 U.S. at 714, 94 S.Ct. at 3110 (enforcement of subpoena stayed pending Supreme Court review), postponement of a decision by this Court on the issue of President Reagan's testimony until the trial is half over may well result in a very lengthy interruption or even a mistrial.

## V

### *Requirement to Testify*

In addition to the factors discussed *supra*, the Court is constrained to observe that, given the showing defendant has already made, it would not be fair in these circumstances to refuse his request for the testimony of the former President under whose direct supervision he was working during the period covered by the indictment. The sense of the inequality of the process would be buttressed by the fact that the grand jury which returned that indictment was in possession of, and presumably relied on, sworn answers from President Reagan himself as well as on evidence supplied by many of his senior advisors.[45] It would hardly promote a fair trial to allow the prosecution to rely on the President's direct and indirect evidence in these various forms, but to shut off that source of evidence, on the ground that it would invade Presidential prerogatives, when the defendant asks for it.

In this connection, it must also be noted that President Reagan has repeatedly stated his willingness to cooperate with all official bodies investigating the so-called Iran-contra affair, and that he has, in fact, faithfully carried out that pledge. Thus, he has cooperated with the Tower Commission and the Independent Counsel, in addition to the grand jury, and he has dispatched his senior aides to testify before congressional committees. There would appear to be no basis upon which a line may be drawn at the criminal trial of his former close advisor. Although the President's actions may not amount to a waiver of privilege, they surely demonstrate a diminished expectation of confidentiality.

The history of this litigation indicates that the Court has been mindful, indeed most solicitous of the former President's prerogatives; that it has imposed upon defendant the burden to make a stringent and detailed showing of the materiality of and his need for the former President's testimony; and that it has meticulously evaluated that showing. In fact, in order to minimize any intrusion into Presidential prerogatives, the Court has applied a more demanding standard to the request for President Reagan's testimony than has been applied in any other case involving Presidential evidence. However, the Court will not permit this defendant, who is charged with serious criminal offenses, to be deprived of evidence necessary for his defense on the basis of the unprecedented and impossible-to-navigate obstacle course, described *supra* in this Part of the Opinion, that Reagan–Justice Counsel would have him run.

On the basis of its review of the parties' submissions, and of its findings herein, it is the Court's ruling that defendant is entitled to serve the subpoena on former President Reagan, requiring him to testify on the subjects covered by the questions the Court has sustained, and that the former President shall comply with that subpoena.

However, the former President and the incumbent President will be afforded the opportunity to assert executive privilege, provided that this is done expeditiously.[46] If such a claim is made, Mr. Reagan will be required to testify only if the Court rules at that time that defendant's need for the information outweighs the claim of privilege. *United States v. Nixon*, 418 U.S. at 711–13, 94 S.Ct. at 3109–10. *See* note 14, *supra.* Additionally, to the extent that defendant expects by his questions to elicit

---

**45.** Furthermore, a number of high Executive Branch officials responsible to Mr. Reagan at the time the events took place will in all likelihood be called by the government to testify against defendant.

**46.** The trial is due to begin in a little over two weeks, and if the former President's testimony is to be taken before trial (*see* Part VI, *infra*) any further preliminary issues will have to be resolved forthwith. Accordingly, the decision on executive privilege will have to be made and communicated to the Court not later than February 9, 1990. The executive privilege question has been known to, and thus presumably under consideration by, the parties ever since November 16, 1989. *See also*, Memorandum of the Department of Justice at 17 n. 7, suggesting that if the defendant's primary questions are provided to the former President in advance—as they have been—executive privilege concerns could be considered in advance of the actual questioning.

sensitive national security information from the President, it will be his obligation to initiate the CIPA process relating to such information sufficiently in advance of the anticipated testimony to allow the Court to render a timely ruling on any disputes.[47]

## VI

### *Written Interrogatories*

■ What remains to be decided are the method by which and the forum in which President Reagan's evidence is to be provided. Defendant argues that nothing will suffice under the Constitution except President Reagan's testimony at the trial itself; counsel for the former and the incumbent Presidents contend that Mr. Reagan should instead be permitted to provide answers to written interrogatories or to appear for a videotaped deposition.

In support of his arguments with respect to written interrogatories, defendant relies primarily upon the Sixth Amendment to the Constitution and Rule 15 of the Federal Rules of Criminal Procedure. The Sixth Amendment guarantees to a defendant in a criminal case the right to "offer the testimony of witnesses, and to compel their attendance, if necessary." *Washington v. Texas,* 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967); *see also, United States v. Edwards,* 469 F.2d 1362, 1369 (5th Cir.1972). The constitutional provision guarantees the right to call "witnesses," that is, to persons who take the stand, permitting the jury to observe their demeanor and forcing them to respond spontaneously to questions. Indeed, the Supreme Court explicitly noted in *Coy v. Iowa,* 487 U.S. 1012, 108 S.Ct. 2798, 2800–03, 101 L.Ed.2d 857 (1988), that face-to-face confrontation encourages truthfulness. On this basis, written answers to interrogatories are inadequate to fulfill the essence of the Sixth Amendment right. Even in civil cases, interrogatories are used in addition to, rather than in lieu of, live testimony. *See, e.g., National Life Insurance Co. v.*

*Hartford Accident & Indemnity Co.,* 615 F.2d 595, 600 n. 5 (3d Cir.1980). The utility of, and hence the necessity for, the give-and-take of oral testimony is obviously even greater in a criminal case where the liberty of the accused is at stake.

At bottom, the defendant is attempting by his subpoena to penetrate the curtain that almost inevitably appears to surround any President and ex-President, where answers to queries, no matter by whom made, are frequently written out in advance, usually with the assistance and collaboration of, or entirely by, staff members. Poindexter, who was one of those staff members for over three years, in frequent contact with the President, is fighting for his reputation and his liberty. To have a fair chance in that fight he must have appropriate scope in attempting to penetrate the traditional presidential curtain. The proposal that written interrogatories be employed in capturing the Reagan testimony will not accomplish that objective. Moreover, demeanor and hence credibility cannot be judged by written answers. For these reasons, the Court declines to relegate this criminal defendant to seek answers from a crucial witness by written interrogatories.

## VII

### *Videotaped Deposition*

■ The alternative of a videotaped deposition is objected to by both sides: to some extent by the President on the basis that it imposes too great a burden on him, much more vigorously by defendant on the ground that it is not an adequate substitute for in-court testimony.

### A. *Objections By the President*

The former President objects to have his testimony taken by deposition, stating that he "does not in any way concede that a deposition would be necessary or appropriate in this case...."[48] However, relative-

---

47. Defendant's section 5 CIPA notice will likewise have to be filed by February 9, 1990.

48. Reagan Memorandum at 28. It should be noted, however, that the former President's opposition to a deposition is substantially less

ly little has been advanced on behalf of the former President or by the Department of Justice in support of the objection.

To be sure, the point is made, just as it is with respect to in-court testimony, that the compelled testimony of a former President would have an adverse impact on the Presidency, in that the confidence of foreign leaders in the President of the United States would be shaken by his appearance in such proceedings, and more particularly by such events as the failure of government counsel to object to questions that could conceivably affect these foreign interests and that they may regard as "a slight to [their] dignity and stature," and that "the very selection of which questions to answer may offend foreign sensitivities." [49] The suggestion is also made on behalf of President Reagan that he should not be required to testify because "the spectacle of a former President being subjected to peremptory judicial process may chill foreign governments in the way they deal with the President now and in the future." [50]

In view of recent developments toward the establishment of democratic forms of government in many parts of the world, and the concomitant halt to the isolation and organized adulation of all-powerful leaders, foreign nations might regard the amenability of a President of the United States to the processes of justice and to courts of law with understanding, and perhaps admiration, rather than with scorn.

In any event, the Court categorically rejects the suggestion that foreign appreciation or lack of appreciation of procedure under American law or "foreign sensitivities" regarding that procedure should be determinative of what a United States court must do in a criminal case involving an American citizen, indeed one who was a naval officer and until recently a high official in our government.

### B. Defense Objections

Defendant, too, objects to the alternative of a videotaped deposition. As with respect to written interrogatories, defendant relies on the Sixth Amendment, although as the paucity of his case citations attests, that his legal position is much weaker. [51]

Defendant's reliance on Rule 15 of the Federal Rules of Criminal Procedure is no more persuasive. That Rule allows for the testimony of a party's prospective witness to be taken and preserved for use at trial "whenever due to exceptional circumstances of the case it is in the interest of justice," and exceptional circumstances are in the main equated with the unavailability of the witness. *United States v. Ismaili*, 828 F.2d 153, 159 (3rd Cir.1987); *United States v. Sun Myung Moon*, 93 F.R.D. 558, 559 (S.D.N.Y.1982). The unavailability of a witness is, in turn, defined in Rule 804(a) of the Federal Rules of Evidence. That Rule declares a potential witness to be unavailable in terms that closely fit the present situation. [52]

Defendant also argues that the substitution of testimony at a deposition for testimony in a courtroom would deprive him of certain practical advantages, in particular the right to require the witness to face the jury and the public personally, in a formal

---

strong than it is to in-court testimony. *Id.* at 12–16, 28.

**49.** Reagan Memorandum at 15, 28; Department of Justice Memorandum at 12.

**50.** Reagan Memorandum at 15.

**51.** The only precedents cited—*Taylor v. Illinois*, 484 U.S. 400, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988); *United States v. Burr, supra;* and *United States v. Mann*, 590 F.2d 361 (1st Cir.1978)—do not support defendant's position. One case involved only transcribed depositions; another

was decided before the advent of videotapes; and in the third no countervailing interests were present.

**52.** Rule 804(a)(1) regards as "unavailable" a person who "is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of his statement," and Rule 804(a)(5) similarly considers "unavailable" a potential witness who "is absent from the hearing and the proponent of his statement has been unable to procure his attendance ... by process or other reasonable means." *See generally*, 2 Moore's Federal Practice, Vol. II, § 804.03.

judicial setting.[53] There is no question but that this is a departure from normal criminal procedure, but the question is whether this flaw in terms of the defendant's interests can be justified by the extraordinary circumstance of the compelled testimony of a former President[54] and the consequences flowing therefrom. These consequences are discussed below.

### C. *No Direct Precedent for In–Court Testimony*

As indicated above, there is an absence of a direct precedent in two hundred years of American history for the compelled testimony in a courtroom by an incumbent or former President. While that fact is surely not determinative, it does call for a sense of caution by this Court. Did the judges from John Marshall to John Sirica who did not, ultimately, insist on Presidential testimony in a courtroom, exhibit a sensitivity for the play in the joints in our tripartite system of government that should at least be considered here? This Court believes so.[55] But there are also more tangible reasons for giving serious consideration to the alternative of a videotaped deposition.

### D. *Need for Consultation*

One significant practical problem with in-court testimony by a former President is that the possibility of executive privilege available to him, to the incumbent President, or to both, is ever present.[56] A former President has the authority to claim executive privilege for confidential communications occurring during his incumbency. *Nixon v. Administrator of General Services,* 433 U.S. at 448–49, 97 S.Ct. at 2792–93. Insofar as the protection of national security interests and those of a diplomatic nature are concerned, the incumbent President may assert executive privilege with respect thereto, either on his own or in conjunction with the former President. *See generally, Department of the Navy v. Egan,* 484 U.S. 518, 527, 108 S.Ct. 818, 824, 98 L.Ed.2d 918 (1988).

It is also clear that the claim of executive privilege is a serious matter and is not to be advanced lightly in any case, and especially so in a case where a former close subordinate of the President seeks his testimony. It may therefore be anticipated that, should questions be asked of former President Reagan at the trial that arguably impinge upon executive privilege, he might wish to consult with his own counsel, as well as with counsel for the incumbent President, before making a determination whether to assert that privilege. Moreover, the Court would at that point have to render a decision with respect to the weight of the privilege claim in light of defendant's right to a fair trial. Certainly, such consultations, proceedings, and decisions, not to mention appeals, would take time, and they could seriously disrupt the orderly flow of a trial taking place in a courtroom where a jury is also present and waiting.[57]

Defendant's response to these considerations is not convincing. He says that, since

---

53. With regard to defendant's related objection, that is, to the absence of the judge from the proceedings, *see* Part VII, *infra.*

54. In *Nixon v. Fitzgerald, supra,* 457 U.S. at 759, 102 S.Ct. at 2706, the Supreme Court referred to the President's unique status under the Constitution.

55. After all, as Justice Holmes taught us, the life of the law is not logic but experience. O. Holmes, The Common Law 5 (Howe ed. 1963).

56. Although the Court is requiring the former President and the current Administration to claim the privilege early on, unanticipated testimony and other events at the trial could result legitimately in such claims being made at that time.

57. Moreover, as the Department of Justice notes with some justification, "[o]n-the-spot decisions must be made regarding which questions can be answered without revealing sensitive information ... [and] the former President will likely have to interrupt his testimony constantly so that he can ponder whether or not to answer, and to consult with representatives of the sitting President." Department of Justice Memorandum at 12. Some of these consequences will be minimized by the filings made by defendant in response to the Court's Order requiring him to submit his primary questions in advance of the trial; however, they will not be entirely eliminated.

his subpoena to the former President specifies sixty-seven areas of inquiry which will be "the focus" of his examination at trial, Mr. Reagan "already has sufficient information to determine whether the proposed areas of inquiry are likely to touch upon communications he deems to be 'confidential' and which he believes must remain so."[58] As the Court has already indicated, the sixty-seven areas are so diffuse and potentially wide-ranging that they do not narrow the scope of any inquiry by defendant's counsel by very much.

Even as the areas of inquiry are now limited to the 154 specific questions the Court has approved, the former President will have access in advance only to the "primary questions," and follow-up may be expected within the area of inquiry established by these primary questions. Although this mode of proceeding will reduce the number of times when, in the course of the trial, side issues relating to privilege and the like will need to be discussed at length, it does not eliminate the threat of such discussion, briefing, and possible appellate review, and it may not even reduce them by very much.[59]

### E. National Security Concerns

These considerations are heightened when the claim of executive privilege involves national security considerations. Here again, the dynamics of the trial which demands instant responses, must be juxtaposed against the need for care both in the raising of such issues and in their resolution. Additionally, as President Reagan correctly points out, "[r]equiring delicate constitutional and national-security decisions that may, on reflection, be entirely unnecessary undermines not only the confidentiality protected by executive privilege but the dignity of the President and the judiciary as well. Nor can the defendant

be said to benefit from such an unpredictable and tumultuous process."[60]

Defendant's response is, again, not cogent. He contends that under section 5 of CIPA he has the obligation to notify the government in advance of all classified information he anticipates eliciting from Mr. Reagan at trial, and that the Court could settle the issues of use, relevancy, and admissibility in advance of trial in the context of a section 6 CIPA hearing, even if Mr. Reagan testified at the trial itself.

That much is certainly correct. However, a President, by definition and in practice, is the repository of the nation's most vital secrets. It is the Court's judgment that in the exceptional circumstance of testimony by an individual who was the President of the United States until a little more than a year ago, it is best that, when that person is called upon to testify on subjects with which he dealt only recently,[61] the insurance provided by CIPA be augmented by having that testimony taken in more private surroundings than a courtroom where the inadvertent disclosure of sensitive information would be beyond recall. This process would, of course, be valid only if it did not infringe on the constitutional and other legal rights of the defendant.

On that issue, it is the Court's conclusion, based on all the factors enumerated above, that a videotaped deposition of the former President, properly conducted, will adequately protect defendant's rights. Most significantly, testimony by way of a deposition will preserve the spontaneity of courtroom testimony. The attorneys will be able to examine and cross-examine in their accustomed fashion, and the witness will have to answer immediately, on his own, and in accordance with the usual and customary procedural and evidentiary rules. As the deposition testimony will be videotaped, the witness' demeanor will be fully apparent to the ultimate trier of facts,

---

58. Memorandum at 17–18.

59. Even if such claims are ultimately rejected, *e.g.,* as coming too late without legitimate excuse, their possibly extended ventilation could probably not be avoided.

60. Reagan Memorandum at 14.

61. These subjects, as the record of this case shows, are often tied to sensitive security information.

in some sense in magnified form.[62] Various courts have in recent years upheld the use of videotaped depositions against challenge by criminal defendants based on the Confrontation Clause of the Sixth Amendment and Rule 15. *See United States v. Keithan,* 751 F.2d 9 (1st Cir.1984); *United States v. Tunnell,* 667 F.2d 1182 (5th Cir. 1982); *United States v. Acevedo–Ramos,* 605 F.Supp. 190 (D.P.R.1985); and see particularly Justice O'Connor's concurring opinion in *Coy v. Iowa, supra,* 108 S.Ct. at 2804 (child abuse victim's testimony via closed circuit television).

For the reasons stated, the Court, having permitted service of defendant's subpoena ad testificandum on former President Ronald Reagan (*see* p. 154, *supra* ), hereby directs that President Reagan shall appear for examination by counsel at a videotaped deposition to be held in advance of the trial of this cause.[63]

## VIII

### Resolution of Disputes

■ As noted above, the defendant has been required to submit a list of specific questions; these questions have been filed, as have been various objections; and the Court has approved some of the questions, eliminating others as lacking *inter alia* in relevancy and materiality. Defendant's examination of the former President at the deposition will be restricted to these questions as limited by the Court, and to legitimate follow-up questions in the same area of inquiry.

It is inevitable that disputes will arise concerning such issues as whether particular questions to the former President constitute legitimate and proper follow-up; whether other follow-up questions are relevant, material, and otherwise admissible under the usual rules of evidence; whether certain lines of inquiry may be foreclosed by the doctrine of executive privilege; and possibly whether problems exist under the Classified Information Procedures Act. In order to avoid the extended delays inherent in interruptions of the deposition to secure resolutions of such disputes, the Court will be present at the deposition to rule on the questions themselves,[64] and it will also rule at that time on executive privilege issues, if any, and to the extent feasible, on any CIPA questions.[65]

This process should obviate the necessity for repeated depositions by the former President, as disputed issues are resolved piecemeal in Washington. Furthermore, with the trial of this defendant due to begin in approximately two weeks, unless decisions concerning disputed evidentiary matters regarding the Reagan testimony are made then and there to the extent that it is possible to do so, it could be that the deposition of the former President would not be completed in advance of the trial.[66]

## IX

### Conclusion

Former President Ronald Reagan is claimed by Admiral Poindexter to have direct and important knowledge that will help to exonerate him from the criminal charges lodged against him. In view of the prior professional relationship between the

---

**62.** The nation's collective memory of televised Presidential debates, from that between Richard Nixon and John F. Kennedy on, has instructed us as to how we have been able to make judgments on that basis.

**63.** The Court expects to consult with all counsel regarding place, time, and logistics of the deposition. President Reagan's convenience will be given substantial consideration, both as to the area where the deposition will be conducted and as to the date.

**64.** The Court will also decide any disputes as to what portions of the videotape shall be edited out (*e.g.,* any inadvertent or otherwise inappropriate national security or foreign policy information or discussions among counsel) before the tape is shown to the jury.

**65.** Counsel for the former President and for the Department of Justice have indicated that they may need to confer, with or without the former President, to decide on objections these issues, as well as on possible substitutions with respect to subjects which have national security implications.

**66.** This may be the reason why at the January 23, 1990 hearing counsel for defendant suggested the Court's presence. Transcript at 21.

two men, and defendant's showing discussed above, that claim cannot be dismissed as fanciful or frivolous. That being so, it would be inconceivable—in a Republic that subscribes neither to the ancient doctrine of the divine right of kings nor to the more modern conceit of dictators that they are not accountable to the people whom they claim to represent or to their courts of law—to exempt Mr. Reagan from the duty of every citizen to give evidence that will permit the reaching of a just outcome of this criminal prosecution. Defendant has shown that the evidence of the former President is needed to protect his right to a fair trial, and he will be given the opportunity to secure that evidence.

At the same time, the Court has the obligation to protect the rights of the former President and the privileges of the Presidency from the risk of unnecessary disclosures of confidential deliberations or national security subjects. To achieve those ends, and to safeguard the judicial process from disruption, the former President's evidence will be taken by way of a deposition where recesses can be called as necessary, and where consultations can be held on such subjects as the need for the invocation of executive privilege or the handling of sensitive defense information. The Court will be present to ensure that these recesses and these consultations are limited to legitimate subjects.

This method of proceeding will serve to avoid the sterility of written answers to written questions and preserve the flexibility and spontaneity that are essential to the effective examination of a witness. It will also ensure that there will be no revelation of national security and other secrets not appropriate or necessary for disclosure to the jury and the public. The Court is confident that this procedure, while necessarily taking account of the special aspects of this particular case, is in the spirit of the solutions that have been fashioned in the past when, in the course of this nation's history, the courts were confronted with the difficult issues that invariably surround a de-

mand for the call of a President to the witness stand.

## ORDER

Upon consideration of defendant's petition for leave to serve a subpoena *ad testificandum* on former President Ronald Reagan, the memoranda in support thereof and in opposition thereto, the exhibits filed with the Court, the hearing held on January 23, 1990, and the entire record herein, it is this 5th day of February, 1990, in accordance with an Opinion issued simultaneously herewith

ORDERED that:

1. Former President Reagan shall testify in this case pursuant to defendant's subpoena on the questions identified in defendant's submission of January 26, 1990, as limited by the Court this date, and on any legitimate follow-up questions.

2. Former President Reagan's testimony will be taken by way of a videotaped deposition. The Court will consult with counsel for the parties with respect to an appropriate place and a date prior to the start of trial.

3. The Court will be present during the deposition to rule on issues of relevancy, materiality, disputes on legitimate follow-up questions, any remaining executive privilege or CIPA issues, and any other factual, legal, evidentiary, or procedural disputes.

4. Any claims of executive privilege by the former President or the incumbent President shall be filed by February 9, 1990, in order that decisions thereon may be made prior to the start of the trial.

5. Defendant shall advise the Court by February 9, 1990 of any questions, whether primary or follow-up, that may result in the revelation of classified information requiring resort to the CIPA process, and the CIPA process will be undertaken promptly thereafter.

## MEMORANDUM AND ORDER

On January 30, 1990, at the conclusion of a lengthy process that included complete briefing by the interested parties,[1] the

1. The Department of Justice was permitted full

participation in this process although the diaries

Court ordered the disclosure to defendant of a relatively small number of entries from former President Reagan's diaries. The Court selected the entries to be so disclosed on the basis of their relevancy and materiality to this case and the Poindexter defense, following an *in camera* review of a much larger number of diary entries, most of which the Court rejected for purposes of disclosure. The deadline for that disclosure was set for February 5, 1990, in view of the fact that the trial is to begin on February 20, 1990, and the defendant obviously needs some time to integrate the diary entries into his overall defense strategy. On the afternoon of February 2, 1990, at the start of the weekend just prior to the deadline, the Department filed the instant motion, in which it requests that the Court alter its January 30 Order so as to postpone the deadline by an unspecified "reasonable period." Defendant has filed a memorandum in opposition to the Department's request.

The Department's motion asserts that postponement of the deadline for disclosure of the evidence, notwithstanding the approaching trial date, has become necessary because of "developments since ... entry" of the Order. However, the Department cites no such new developments, nor is the Court aware of any.

The basic substantive reason given by the Department for its request is that stipulations would be a helpful device here, and that a delay would allow the Independent Counsel and the defendant to stipulate to the facts regarding the knowledge and actions of the former President that are material to this criminal prosecution. That information, however, is far from new. The Independent Counsel and the defendant have already attempted to arrive at stipulations with respect to such facts in the context of President Reagan's testimony, in obedience to an Order of this Court issued on January 24, 1990, requiring them to undertake such a process. However, the two parties informed the Court in separate submissions dated January 30, 1990, that, despite their efforts, they had been unable to come to agreement on acceptable stipulations.

The Department asserts that these stipulation negotiations broke down "apparently because the defendant will not place in writing the matters to which he wants stipulations," and it goes on to observe that "this cannot be a sufficient reason to abandon a procedure that could so obviously lead to a stipulation, such as in" the Oliver North case. This assertion is replete with errors.

First, the process did not break down simply because someone did not wish to place something in writing; it broke down for more substantive reasons, as discussed below. Furthermore, even if defendant had declined to notify the prosecution of what he expected to prove through the testimony of President Reagan, that was his perfect right under the Constitution. Absent a specific statute or Rule, a defendant in a criminal case is not required to alert the prosecution to his evidence in advance of trial.[2]

Second, the Department is correct in observing that, had defendant been willing to reveal his defense evidence to the prosecution, his failure to place that evidence in writing would have been unreasonable. But in fact, as the parties' submissions plainly show, and as common sense dictates, a more fundamental reason was involved here. The submissions indicate that one reason for the parties' failure to stipulate to the content of President Reagan's testimony is that they have fundamentally different views of what the testimony would reveal.

This difficulty is likewise present in any hypothetical stipulation process for the diary entries. There is, moreover, one basic

are obviously those of the former, not the incumbent President, in view of the Court's recognition that the Department has an interest in this matter, albeit a more attenuated one than those of other parties.

**2.** It is for that reason that, for example, the Court has kept from the prosecutor, *i.e.*, the Independent Counsel, the details of the evidence defendant seeks to adduce through the former President.

problem which renders the Department's proposal for stipulations even more improper, and that is that, unlike the Independent Counsel, the defendant has never seen the diary entries or any extractions therefrom. The Department's suggestion that the prosecution and the Court could on their own stipulate to facts for use in defendant's criminal trial without participation by the defendant ("Court can compare the Independent Counsel's proposed . stipulation with the diary entries to ensure that all pertinent information has been covered") (Motion at 3), is absurd.

Third, the Department's reference to the Oliver North case is inapt because the negotiations there occurred under the mandate of the Classified Information Protection Act (CIPA), a congressional directive which imposes sanctions on the party which refuses to agree to substitutions, including stipulations, with respect to documents containing highly sensitive and classified security information. None of that is applicable here at this stage.[3] In any event, those diary entries which contain classified information will subsequently be the subject of possible stipulations pursuant to the CIPA process.[4]

The short of it is that the stipulation route has been tried with respect to the Reagan evidence and found to be ineffective, as it was almost certainly bound to be when the parties were being asked to paper over differences that they deem central to their respective positions. That difficulty is compounded, of course, when, as here, one of the parties is protected by the Constitution from being required to agree in advance of trial to facts that, consistently with the presumption of innocence, it is entitled to have the government prove beyond a reasonable doubt by admissible evidence.[5]

Finally, the Department of Justice characterizes its request as a means to avoid a "potentially serious constitutional confrontation." But no constitutional confrontation, actual or potential, exists. The Supreme Court has authoritatively decided that in conflict between the fair trial rights of a defendant in a criminal case and the general prerogatives of the President, the former prevails. *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *see also, Marbury v. Madison*, 1 Cranch 137, 2 L.Ed. 60 (1803).

For all these reasons, the Court concludes that the Department's motion—which ignores or glosses over all these considerations—has no substantial basis. The motion is nothing more than an attempt to delay into the indefinite future compliance with the Order which the Court issued on January 30, 1990, after extended and careful consideration. In view of the trial date of February 20, 1990, which was set some time ago, such a delay is out of the question, in the absence of a far more credible and convincing basis than has been advanced by the Department of Justice. It is important also to note in this connection that in its effort the Department stands alone. Not even counsel for President Reagan—whose diaries, after all, are the documents at issue—have sought a postpone-

3. The Court is issuing this date an Opinion regarding the subpoena for the oral testimony of former President Reagan which further explains the Court's understanding of the stipulations process, its strengths, and its limitations in the context of criminal prosecutions.

4. Negotiations on other subjects in obedience to CIPA have worked extremely well in the instant case, as they did in *North*.

5. The Department of Justice also argues that "some or all" of the information contained in these diary entries is in the public domain. Yet it offers only two examples to support this rather sweeping claim, and, on close examination, the two examples do not support it.

The Department asserts that all the facts in subpoena Item 29 are in paragraphs 62 and 63 of a stipulation used in the *North* trial, and that subpoena Item 12 is contained in stipulation paragraph 72. This is not the case. For example, subpoena Item 29 discusses apparent threats by the military of a Central American nation to eject the Contras from their bases inside that country. The stipulation does not mention this issue in any fashion. Likewise, subpoena Item 12 contains a somewhat ambiguous comment arguably indicating that the former President knew of defendant's activities on behalf of the Contras. The stipulation makes no mention of this point.

ment or otherwise joined in any way in the Department's motion.

For the reasons stated, it is this 5th day of February, 1990

ORDERED that the motion be and it is hereby denied.

### MEMORANDUM AND ORDER

The government has moved to amend the indictment and narrow the conspiracy charge in this case by deleting the name of "Albert Hakim" from paragraphs twelve and fifty of Count One. The motion will be granted.

This Court has held that a reduction of the language of an indictment does not deny to a defendant his rights if (1) the indictment, as narrowed, continues to state a complete offense, and (2) the offense is contained in the indictment as originally returned. Memorandum and Order, July 25, 1989, 719 F.Supp. 6, 8. Clearly, the indictment, as the government proposes to amend it, would state a complete criminal offense.[1] Indeed, defendant does not argue otherwise.

It is equally clear that the indictment, as amended, would not enlarge on the grand jury's return, but would be entirely encompassed within it. Memorandum at Order at 8. See also, United States v. American Waste Fibers Co., Inc., 809 F.2d 1044, 1046 (4th Cir.1987) (existence of the conspiracy, rather than particular identity of the conspirators, is the essential element of the crime); United States v. DeCavalcante, 440 F.2d 1264 (3d Cir.1971) (same); United States v. Davis, 679 F.2d 845, 851–52 (11th Cir.1982), cert. denied, 459 U.S. 1207, 103 S.Ct. 1198, 75 L.Ed.2d 441 (1983) (same).

Defendant speculates that the government's motion to amend is motivated by a desire to "hide from the jury the fact that one of its witnesses ... originally was named as a coconspirator and codefendant by the grand jury." He offers nothing to support this claim, and the government asserts that the true purpose of the motion is to conform the indictment to the anticipa-

ted proof at trial. In short, defendant's argument lacks factual support.

Defendant also asserts that the amendment would leave the indictment unduly confusing because "Mr. Hakim's name ... appears in other paragraphs throughout Count One in a context suggesting that he was a participant in the alleged conspiracy." Defendant is concerned that it will be unclear from the indictment whether "Mr. Hakim is in the conspiracy or he is out of the conspiracy." The Court does not share this concern. The indictment, as the government proposes to amend it, makes clear that Mr. Hakim performed certain acts related to the Enterprise, but that he is not part of the alleged conspiracy.

Accordingly, it is this 5th day of February, 1990

ORDERED that the motion to amend be and it is hereby granted.

---

**1.** If amended, Count One would continue to allege all the elements of a conspiracy, i.e., it would allege an agreement between at least two individuals with an unlawful object, means for effectuating that conspiracy and overt acts committed pursuant thereto.