904 F.2d 707
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Tracy HAMAN, Plaintiff-Appellee, Cross-Appellant,
v.
J.C. PENNEY COMPANY, INC., Defendant-Appellant, Cross-Appellee.
 Nos. 89-5329, 89-5458.
 United States Court of Appeals, Sixth Circuit.
 June 19, 1990.
 
 Before KENNEDY and RYAN, Circuit Judges, and JULIAN ABELE COOK, Chief District Judge.*
 PER CURIAM:
 
 
 1
 Defendant J.C. Penney Company, Inc.[1] appeals from the decision of the District Court holding that it discriminated against plaintiff Tracy Haman on the basis of her sex, in violation of 42 U.S.C. Sec. 2000e(k). In a bench trial the court found that Haman was terminated by Penney due to the fact that she was unmarried and pregnant, and that the defendant's statement that she was being fired for her failure to comply with the time sheet rule was a pretext for discrimination against her. Plaintiff cross-appeals claiming that the District Court erred in staying the judgment including reinstatement during the appeal and in failing to allow plaintiff's backpay liability to accrue during its pendency. Penney argues that the District Court erred in disregarding the testimony of the personnel manager as to his reasons for termination and that there is no evidence to support the District Court's finding of discrimination because the personnel manager who made the decision to fire Haman did not know that she was pregnant.
 
 
 2
 Plaintiff was employed by Penney from July 22, 1985 through June 13, 1986 as a shoe sales specialist in the defendant's Northgate store in Chattanooga, Tennessee. On June 13, 1986, plaintiff was terminated, allegedly for "violation of time sheet procedures." Plaintiff filed a written charge of sex discrimination with the Tennessee Human Rights Commission and obtained a right to sue letter.
 
 
 3
 Plaintiff began working for defendant when she was eighteen-years-old and single. She testified at trial that although she was told of several areas in which she needed to improve during her March 24, 1986 evaluation, she did in fact improve, and during May of 1986 she was the top salesperson for two weeks. Plaintiff also testified that during this March evaluation she was written up for signing in and out at the same time on different occasions in March, but that she did not repeat this conduct again. The District Court noted that the Performance Review filled out on March 24, 1986 by Thomas W. Bickford, the plaintiff's supervisor, does not reflect that these two time sheet refractions were considered to be of such a nature so as to affect plaintiff's evaluation because her evaluation indicated that she met the requirements of the job in regard to attendance, on-time record, and use of company forms and procedures.
 
 
 4
 On June 6, 1986, after calling in to inform her employer that she would arrive late to work that day, plaintiff arrived and signed in on Alicia Lloyd-Cooper's line, writing 1:00 instead of the actual time, 1:15.[2] The plaintiff subsequently signed in at 1:15 in the correct space while signing out for dinner, and although she was aware that Bickford had seen her arrive at work and sign in, she did not discuss the time sheet error with him. On June 6, 1986, plaintiff, who was still single, was pregnant and had been wearing a J.C. Penney maternity dress to work. The plaintiff had not told anyone that she was pregnant.
 
 
 5
 On June 13, 1986, plaintiff was called into the office of Jerry Dale, J.C. Penney's personnel manager. Bickford and Gladys Hurley were also present. Plaintiff was given various forms to sign, and Dale told her that she was being discharged for a time sheet violation.
 
 
 6
 Plaintiff's fellow employee, Alicia Lloyd-Cooper, testified that she had worked for the defendant from the summer of 1984 until she left in later 1986 to take a job with another retail store. She stated that although Bickford had excellent merchandise skills, he had "people problems" and lacked skills in that area.
 
 
 7
 Lloyd-Cooper also testified that she had made errors on the sign in sheet herself and had not asked her supervisor to authorize the correction of those errors as company policy dictates. She stated that sign ins and sign outs were typically done all at once and adjusted if wrong, and that it would not benefit a commissioned employee such as the plaintiff to sign in early because the increase in time would result in an apparent decrease in productivity. Lloyd-Cooper went on to state that although she had corrected her times on the time sheet without her supervisor's authorization, she had never received a written reprimand and had never received a performance evaluation. She was routinely the top salesperson for the week.
 
 
 8
 Lloyd-Cooper stated that on the Sunday afternoon before plaintiff was fired, she was in the storeroom with Bickford and that she was on a ladder adjusting the stock when he expressed concern that plaintiff would not be able to perform her duties "because of her condition." Cooper said that three to five weeks prior to this she had noticed plaintiff's change in weight and clothing. She stated that she had also noticed that plaintiff was wearing a J.C. Penney maternity dress because Bickford had commented about this dress, asking if it wasn't a dress from the maternity department. When Bickford stated to Lloyd-Cooper that he would not want his wife to go up and down the ladders in the stockroom if she were in plaintiff's condition, Lloyd-Cooper told him that plaintiff needed to work now more than ever. Bickford replied that plaintiff could still keep her benefits even if she were not employed.
 
 
 9
 Lloyd-Cooper also stated that on June 6, 1986, when she went to lunch, she changed plaintiff's 1:00 time sheet entry, which was on Lloyd-Cooper's lunch sign out space, to 4:05 p.m. She stated that when Bickford found that she had made this change he became very angry. Bickford documented at the bottom of the sheet that Lloyd-Cooper had made this change in deliberate defiance of his orders. Lloyd-Cooper was never written up or given a reprimand for her direct defiance of her supervisor's orders.
 
 
 10
 The District Court found that the conversation between Lloyd-Cooper and Bickford in fact took place and that Bickford knew plaintiff was pregnant.
 
 
 11
 Plaintiff argues that the District Court erred in finding that defendant would not be required to reinstate plaintiff during the appeal procedure and in refusing to allow defendant's backpay liability to accrue during the pendency of this appeal. Defendant argues that the District Court erred in disregarding the testimony of the personnel manager as to his reasons for termination and that there is no evidence to support the District Court's finding of discrimination because the personnel manager who made the decision to fire Haman did not know that she was pregnant. We consider defendant's arguments first.
 
 
 12
 Defendant's first argument is that the District Court erred in disregarding the testimony of the personnel manager as to his reasons for termination. The standard governing our review of the District Court's factual findings is the "clearly erroneous" standard. Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985). " '[A] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " Id. (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948)). However, we are not being asked to hold the court's findings clearly erroneous but to correct its legal error in concluding that a factual issue had not been raised with sufficient clarity to be considered. With respect to the testimony of the personnel manager regarding the alleged reasons for Haman's termination, the District Court stated:
 
 
 13
 All exhibits in the file, including the termination notice, write-ups, and the defendant's answers to interrogatories indicate that the sole reason for the plaintiff's termination was this time sheet violation on June 6, 1986. Although Mr. Dale, the defendant's personnel manager, testified that he made his decision to terminate the plaintiff based upon her personnel file as a whole, the Court will not now entertain this theory because the defendant has not previously framed this factual issue with sufficient clarity so that the plaintiff could have a full and fair opportunity to demonstrate pretext.
 
 
 14
 In any event, based upon the defendant's written policies, and the undisputed time sheet violation made by the plaintiff on June 6, 1986, the Court finds that the defendant has produced evidence of a legitimate nondiscriminatory reason for the plaintiff's termination.
 
 
 15
 Joint App. at 19 (citation omitted, emphasis added). Having disregarded Dale's testimony, not because it was believed to be untrue but because the court believed the issue had not been properly raised, the District Court went on to find that Penney's proffered explanation was not worthy of credence. Defendant argues that the court improperly excluded relevant evidence and that had this testimony been considered, the court may have found Penney's alleged reason for Haman's termination to be credible.
 
 
 16
 The District Court relied upon Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981) in finding that the sole reason for plaintiff's termination was the June 6 time sheet violation. The Court in Burdine stated:
 
 
 17
 The burden that shifts to the defendant, therefore, is to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. The defendant need not persuade the court that it was actually motivated by the proffered reasons.... It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection. The explanation provided must be legally sufficient to justify a judgment for the defendant. If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity. Placing this burden of production on the defendant thus serves simultaneously to meet the plaintiff's prima facie case by presenting a legitimate reason for the action and to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext. The sufficiency of the defendant's evidence should be evaluated by the extent to which it fulfills these functions.
 
 
 18
 Id. at 254-56 (emphasis added; citations and footnotes omitted). The Court also noted, "An articulation not admitted into evidence will not suffice. Thus, the defendant cannot meet its burden merely through an answer to the complaint or by argument of counsel." Id. at 255 n. 9.
 
 
 19
 Defendant argues that its position that termination was based on the entire personnel file was reflected in "every document connected with this case." Defendant's Brief at 11. Defendant cites a number of documents, including its answer and list of contested issues of fact submitted pursuant to the final pretrial order, indicating that this was the case.
 
 
 20
 Plaintiff has conceded that she was not surprised by the introduction at trial of evidence indicating that the reasons for plaintiff's termination included her past employment history. Indeed the evidence of her job performance as well as Dale's testimony as to why she was discharged was admitted without objection. Therefore, we find that the District Court erred in finding that defendant had not framed the reason for its actions with sufficient clarity so that plaintiff had a full and fair opportunity to demonstrate pretext. To the extent that it was a factual finding, it is clearly erroneous. Accordingly, we REMAND this case to the District Court for findings of fact based upon all of the evidence, including evidence indicating that plaintiff was terminated as a result of her entire personnel file.
 
 
 21
 Penney next argues that there is no evidence to support the District Court's finding of discrimination because: (1) Dale, the personnel manager, was not aware of plaintiff's pregnancy and without some knowledge on the part of Penney, there can be no evidence of discrimination due to pregnancy; and (2) the District Court improperly relied upon evidence regarding time sheet violations by other employees.
 
 
 22
 Penney correctly argues that a plaintiff in a Title VII action maintains the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff. Burdine, 450 U.S. at 253. This ultimate burden, however, in reality is comprised of three separate presentations of proof. "First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.' ... Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Burdine, 450 U.S. at 252-53 (quoting McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)). The third step of this analysis "merges with [plaintiff's] ultimate burden of persuading the court that she has been the victim of intentional discrimination. She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Burdine, 450 U.S. at 256 (emphasis added) (citing McDonnell Douglas, 411 U.S. at 804-05).
 
 
 23
 We cannot agree with Penney's statement that "[t]here is simply no evidence in the record that the person who made the decision to dismiss Plaintiff knew of the pregnancy." Defendant's Brief at 15. Penney contends that Dale was the sole decision maker. It is apparent, however, that Bickford, Haman's supervisor, had input into the termination decision, for it was Bickford who filled out the corrective action form that led to Haman's termination. Bickford testified that he did not (and in fact cannot ) recommend dismissal. Joint App. at 212. He has authority, however, to suggest that "corrective action" be taken, for he filled out a "corrective action" form. Defendant contends that plaintiff was aware that her job was in danger if she did not follow the time sheet rules. The District Court could find that filling out a corrective action form under such circumstances would constitute more than insignificant input into a termination decision. Such action could render Bickford a decision maker. Evidence indicating that Bickford was aware of Haman's pregnancy was introduced at trial, and the District Court found that Bickford knew of plaintiff's pregnancy. Thus we disagree with Penney's contention that there is no evidence that the decision maker had knowledge of plaintiff's pregnancy.
 
 
 24
 Penney also argues that the District Court improperly relied upon evidence regarding time sheet violations by other employees. The court, in finding that plaintiff was a victim of disparate treatment and that Penney's proffered explanation was unworthy of credence, relied upon the testimony of Alicia Lloyd-Cooper and the deposition of Polly Ann Carlin, as well as a review of the original time sheets. The court stated:
 
 
 25
 Alicia Lloyd Cooper testified that she too had numerous time sheet violations for which she was never reprimanded or given a write-up. In fact, the day of the plaintiff's time sheet violation, Alicia Lloyd not only altered a time, but did so in direct defiance of her supervisor's direct order, according to the defendant, without any action on the part of the defendant as a result thereof.
 
 
 26
 Polly Ann Carlen [sic] also testified that she had made numerous errors on the time sheet which she corrected without supervisory approval and that she was not disciplined for this policy violation.
 
 
 27
 * * *
 
 
 28
 * * *
 
 
 29
 In viewing the original time sheets which were filed by the defendant, it is obvious that there are numerous strike overs and changes with no indication of whether or not they were approved by supervisory personnel.
 
 
 30
 Joint App. at 19-20.
 
 
 31
 Defendant contends that there is no evidence that the changes on the original time sheets were unauthorized, and that Caroline Rooks, a personnel supervisor, testified as follows:
 
 
 32
 Q: Is it J.C. Penney's policy that when time sheet errors are brought to the attention of management or a supervisor, they always have to initial that?
 
 
 33
 A[Rooks]: Not to my knowledge, it's not necessary they correct it.
 
 
 34
 Q: What would they do, what's their options?
 
 
 35
 A: They could approve the time sheet change, they could initial it if they so chose [sic]. They could tell the associate, okay, I see it's 9:00, it's not 8:00, change your entry. Most of the time sheets are approved at the bottom on a daily basis by the supervisor or merchandiser, anyway.
 
 
 36
 Joint App. at 265.
 
 
 37
 The company policy regarding the recording of time worked, however, reads:
 
 
 38
 Changes to correct mistakes should be made only with the express approval of your supervisor and must be initialed by you and your supervisor. (Changes must be made by crossing out the incorrect entry and entering the proper time. Don't erase.)
 
 
 39
 Joint App. at 494 (emphasis added).
 
 
 40
 This is the same company policy on which Penney is attempting to rely as its basis for Haman's termination. We find it disingenuous of the defendant to argue on the one hand that a violation of this policy constitutes grounds for termination, and on the other hand that the policy was not adhered to in the case of the time sheets that were admitted into evidence. These time sheets, containing changes that are not initialed, when considered together with the testimony of Alicia Lloyd-Cooper and Polly Ann Carlin, indicate that the changes were not authorized.
 
 
 41
 Defendant also argues that the violations of Alicia Lloyd-Cooper and Polly Ann Carlin differed from plaintiff's violations because neither had been caught committing time sheet violations and neither had received a written warning of termination due to a violation. Lloyd-Cooper, however, was caught committing a violation at the same time plaintiff was caught, yet Lloyd-Cooper did not receive a written warning. Further, the fact that neither employee received a warning of termination supports the court's finding--that other employees were committing time sheet violations with impunity.[3]
 
 
 42
 Finally, defendant argues that the District Court discounted the fact that another employee, who was not pregnant, was dismissed for time sheet violations. This employee, Melissa Pickett, however, was an hourly employee, not a commission employee like Haman. We disagree with defendant that this is not a significant distinction. It is much more likely that a company would fire an employee who falsified time sheets where doing so would be financially advantageous than an employee who committed a time sheet violation with nothing to gain (and in fact something to lose) by doing so. Thus we find that the District Court did not err in relying upon the evidence regarding the time sheet violations committed by other employees.
 
 
 43
 Plaintiff raises two issues that we may later be required to consider if the District Court, upon reconsideration of this case in light of all of the evidence, finds that defendant intentionally discriminated against plaintiff. Thus we briefly discuss these two issues here.
 
 
 44
 First, plaintiff argues that the District Court erred in failing to find that the defendant is required to reinstate the plaintiff during the appeal procedure. After ordering reinstatement, the District Court ordered a stay of the judgment in the case pursuant to Rule 62(d) of the Federal Rules of Civil Procedure. The standard of review that we must apply in reviewing such a stay order is one of abuse of discretion. Hawaii Housing Auth. v. Midkiff, 463 U.S. 1323, 1324 (1983). Plaintiff has not argued that the trial court abused its discretion nor do we find such an abuse.
 
 
 45
 Plaintiff also argues that the District Court erred in refusing to allow backpay liability to accrue during the pendency of this appeal. The District Court refused to alter or amend its judgment because plaintiff's motion was filed more than ten days after the entry of the court's last order and was therefore time barred pursuant to Rule 59(e) of the Federal Rules of Civil Procedure. A panel of this Court, however, has denied defendant's motion to dismiss plaintiff's appeal; thus we consider this issue.
 
 
 46
 In its original order in this case, the District Court awarded backpay to plaintiff but was silent regarding the accrual of backpay during the pendency of this appeal. In Albemarle Paper Co. v. Moody, 422 U.S. 405 (1975), the Supreme Court noted, "It is true that backpay is not an automatic or mandatory remedy; like all other remedies under the Act, it is one which the courts 'may' invoke.... However, such discretionary choices are not left to a court's 'inclination, but to its judgment; and its judgment is to be guided by sound legal principles.' " Id. at 415-16 (quoting United States v. Burr, 25 F.Cas. 30, 35 (No. 14,692d) (CC Va. 1807) (Marshall, C.J.)). The Court stated that the District Court's decision must be measured against the purposes of Title VII. The Court stated that these purposes were " 'to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees.' " Id. at 417 (quoting Griggs v. Duke Power Co., 401 U.S. 424, 429-30 (1971)). The Court stated further:
 
 
 47
 It is also the purpose of Title VII to make persons whole for injuries suffered on account of unlawful employment discrimination.... Where racial discrimination is concerned, "the [district] court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future."
 
 
 48
 Id. at 418 (quoting Louisiana v. United States, 380 U.S. 145, 154 (1965)).
 
 
 49
 From this "make whole" purpose, "[i]t follows that, given a finding of unlawful discrimination, backpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." Id. at 421.
 
 
 50
 "A presumption exists in favor of backpay; backpay may be denied only if there are compelling reasons justifying the denial. Consequently, the district court is required to state reasons for the denial in order that a reviewing court may determine if compelling reasons exist." E.E.O.C. v. Rath Packing Co., 787 F.2d 318, 329 (8th Cir.), cert. denied, 479 U.S. 910 (1986). The District Court in the present case failed to state its reasons for failing to allow backpay to accrue pending this appeal and we find no reasons justifying the denial of backpay pending appeal to exist. If upon reconsideration the District Court finds that defendant intentionally discriminated against plaintiff, the court should grant backpay pending any appeal that is taken or set forth adequate reasons for refusing to allow backpay to accrue pending appeal.
 
 
 51
 For the reasons discussed above, we REMAND this case to the District Court for findings of fact based upon all of the evidence, including evidence indicating that plaintiff was terminated as a result of her entire personnel file.
 
 
 
 *
 The Honorable Julian Abele Cook, Jr., Chief United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 Appellant/cross-appellee will be referred to in this opinion as "defendant" or "Penney."
 
 
 [2]
 Defendant argues that plaintiff arrived at 1:25 rather than 1:15. Bickford testified to this effect. The District Court found, however, that she arrived at 1:15
 
 
 [3]
 The argument that management was not aware of the violations is disingenuous as well, for the changes on the time sheets are readily apparent